**Sylvester J. VAUGHNS, Jr., et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.**

**UNITED STATES of America**

v.

**The BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, MARYLAND**

**Deborah A. STONE, et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY.**

**Civ. Nos. 72–325–K, K–81–2597, K–89–186 and K–89–289.**

United States District Court,
D. Maryland.

July 13, 1990.

See also 627 F.Supp. 837.

George H. Mernick, III and Deborah J. Jeffrey, and Hogan and Hartson, Washington, D.C., Thomas I. Atkins, Michael Sussman, Teresa Demchak, N.A.A.C.P. Special Contribution Fund, Brooklyn Heights, N.Y., William L. Robinson and Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs in Civ. Nos. 72–325–K and K–81–2597.

Dick Thornburgh, Atty. Gen. of the U.S., James P. Turner, Acting Asst. Atty. Gen., James S. Angus, Barbara E. Thawley and Michael D. Ricciuti, Attys., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., and Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., for plaintiff in Civ. No. K–89–186.

Clint Bolick, Jerald L. Hill, Mark Bredemeier, Landmark Legal Foundation Center for Civil Rights, Washington, D.C., and Edward Blanton, Blanton & McCleary, Towson, Md., for plaintiffs in Civ. No. K–89–289.

Paul M. Nussbaum and Andrew W. Nussbaum, Greenbelt, Md., and George D. Solter, Gerson B. Mehlman and Alfred L. Scanlan, Jr., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, Senior District Judge.

Has the Board of Education of Prince George's County, Maryland (the Board), operating under an order to eliminate all vestiges of past, *de jure* discrimination, violated either the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution or Title VII of the 1964 Civil Rights Act[1] by the assignment of teachers in order to achieve certain degrees of racial integration within the faculty of each school in its system? That is the question presently before this Court in this consolidated litigation which includes cases instituted both prior to[2] and during 1989. One of the two cases commenced in 1989 was brought by the United States;[3] the other was commenced by a group of black and white teachers.[4] All parties in these cases have agreed to the consolidation of all issues presently pending in these cases. However, those issues which relate to immunity defenses and to damages have not yet been fully briefed and argued and are reserved for later decision; all other pending issues have been fully argued and are decided in this opinion.[5]

### I.

The Board operates a school system consisting of approximately 170 schools, over 100,000 students, and more than 6,000 teachers. The Superintendent of Schools of Prince George's County nominates for appointment by the County Board all principals, teachers and other certified personnel; the Superintendent assigns them to

---

1. 42 U.S.C. § 2000e, *et seq.*

2. *Vaughns v. Bd. of Educ. of Prince George's County,* 355 F.Supp. 1034 (D.Md.1972); 355 F.Supp. 1038 (D.Md.1972), *remanded for further proceedings,* 468 F.2d 894 (4th Cir.1972); 355 F.Supp. 1051 (D.Md.1972), *aff'd,* No. 73–1024 (4th Cir. Jan. 23, 1973), *cert. denied, Eller v. Bd. of Educ. of Prince George's County,* 410 U.S. 910, 93 S.Ct. 968, 35 L.Ed.2d 272 (1973) (*Vaughns I*); *Vaughns v. Bd. of Educ. of Prince George's County,* 574 F.Supp. 1280 (D.Md.1983), *aff'd in part, rev'd in part,* 758 F.2d 983 (4th Cir.1985) (*Vaughns II*).

3. *United States v. The Board of Education of Prince George's County, Maryland,* Civil No. K–89–186.

4. *Stone, et al. v. The Board of Education of Prince George's County, Maryland,* Civil No. K–89–289 (*Stone*).

5. No evidentiary hearings have been requested or held. However, the parties have filed a number of joint stipulations and appendices. While the United States grounds it claims under both the Fourteenth Amendment and Title VII, and the plaintiffs in *Stone* challenge only under the Fourteenth Amendment, their approaches, while not always exactly the same, are in no way inconsistent with one another and are dealt with generally in this opinion as contentions of all plaintiffs in the two 1989 cases. On the other hand, plaintiffs in *Vaughns I* and *Vaughns II,* the preexisting 1989 cases, have generally indicated their agreement with defendants in all of these cases with respect to the present challenges of the United States and of the individual teachers in *Stone.*

All references to plaintiffs stated *infra* in the body of this opinion are to the plaintiffs in the two 1989 cases unless otherwise noted.

positions in the schools and transfers them as the needs of the schools require.[6] The Maryland State Board of Education promulgates the regulations by which teachers' employment contracts are governed; the ordinary employment contract expressly provides that the certificated employee is "hereby employed in the public schools of the said County subject to assignment by the County Superintendent or transfer to some other position with the County . . . ."[7]

In the late 1960's and the early 1970's, public education in the State of Maryland came under scrutiny by the Office of Civil Rights of the U.S. Department of Health, Education and Welfare (HEW). In 1971, the Maryland State Board of Education promulgated a policy which required local boards of education to develop and implement plans and procedures for the attainment of racial balance in the public school systems.[8] According to the State directive:

Local boards of education shall develop and implement plans and procedures for the attainment of racial balance at the various levels of the public school system, reflective of the composition of the population of their respective jurisdictions. These plans and procedures shall apply to the hiring, placing, and promotion of all personnel employed at the various levels of the school system. . . .

Pursuant to that regulation, and in an effort to comply with HEW directives, the Board, on March 25, 1971, adopted Rule 4115.3. Rule 4115.3 requires that "the teaching staff of each of the various public schools of Prince George's County . . . be generally consistent with and reflective of the County-wide racial composition of all teachers employed by the Board of Education."[9] Rule 4115.3, as amended since 1971, remains in effect today as the general policy of the Board.

To achieve the goals outlined in Rule 4115.3, the Board issued two corollary rules, 4115.3(a) and 4115.3(b), thereby implementing a two-phased plan to achieve racial desegregation goals among the faculty of the schools of Prince George's County (the County) by September, 1972. In the first phase, the Board sought to achieve a goal of 5% to 40% black faculty at each school by September, 1971. The second phase of the plan called for minority staffing of no less than 11% and no more than 25% of the faculty at each school by September, 1972, a goal which reflected, within seven percentage points, the percentage of blacks employed by the Board as faculty members in the County schools, namely, 18% in 1972. Although Rules 4115.3 and 4115.3(a–b) did not expressly require that minority staffing approximate the racial composition of the population of the County as a whole, compliance with the rules would have effectively resulted in faculty assignments reflecting the County's minority population representation, since, in 1972, minorities also comprised 18% of the County's population. The two-phase plan of Rules 4115.3(a–b) brought the County's faculty assignment policies into compliance with the directives issued by HEW. *Vaughns v. Bd. of Educ. of Prince George's County,* 574 F.Supp. 1280, 1293 (D.Md.1983), *aff'd in part, rev'd in part,* 758 F.2d 983 (4th Cir.1985) (*Vaughns II*).

6. Md.Educ.Code Ann. § 6–201(b)(2) (1978).

7. COMAR 13A.07.02.02B.

8. COMAR 13A.07.05.01. In a nonevidentiary hearing held in open court in this case on June 19, 1989, the parties agreed that the state regulation was issued, in part, as a response to "pressure" from HEW to cure past racial segregation in the public schools, including discrimination in faculty hiring and assignment.

9. Rule 4115.3 provides in pertinent part:
  The Board of Education affirms its belief that sound educational policy includes the concept that the teaching staffs of each of the various public schools of Prince George's County should be generally consistent with the County-wide racial composition of all teachers employed by the Board.
  The Superintendent of Schools shall proceed immediately with the implementation of transfer and assignment plans. The result of these plans shall produce in each of the County's public schools a racial balance of the teaching staff generally consistent with and reflective of the County-wide composition of all of the teachers employed by the Board of Education. . . .
  The Superintendent shall prepare and implement a plan for each school.

## II.

In 1972, after the Board had already adopted Rule 4115.3 and had begun implementing procedures for correcting racial segregation in faculty assignments, Sylvester J. Vaughns, the father of a student in the County public schools, filed a class-action suit to eliminate segregated conditions and their vestiges from the County school system. In *Vaughns v. Bd. of Educ. of Prince George's County*, 355 F.Supp. 1034 (D.Md.1972); 355 F.Supp. 1038 (D.Md. 1972), *remanded for further proceedings*, 468 F.2d 894 (4th Cir.1972); 355 F.Supp. 1051 (D.Md.1972), *aff'd*, No. 73–1024 (4th Cir. Jan. 23, 1973), *cert. denied, Eller v. Bd. of Educ. of Prince George's County*, 410 U.S. 910, 93 S.Ct. 968, 35 L.Ed.2d 272 (1973) (*Vaughns I*), the complaint included, *inter alia*, allegations of discrimination in student and faculty assignment and sought injunctive and other relief. On July 6, 1972, plaintiffs and defendants in *Vaughns I* filed a Joint Stipulation of Facts with this Court which acknowledged that "many of the schools operated by the defendant which have racially disproportionate student bodies also have racially disproportionate faculties."[10] The Joint Stipulation also stated, however, that: (1) in 1971 the Board had adopted Rule 4115.3 requiring that "every public school operated by the defendant will have a racial balance of the teaching staff generally consistent with and reflective of the countywide racial composition of all the teachers employed by the Board of Education prior to the commencement of school opening, September 1972"; (2) the Board had accomplished the first phase of the two-stage faculty desegregation plan by September 1971; and (3) the Board had begun the process of transferring teachers to achieve its Phase II faculty desegregation goals.[11]

On July 25, 1972, this Court granted the *Vaughns I* plaintiffs' motion for summary judgment, holding that the defendants had maintained a school system racially segregated by law until 1954 and had failed to take adequate steps to dismantle that system between 1954 and 1972. As a result, this Court ordered the Board to develop a workable desegregation plan. In its opinion, this Court noted that it "has been informed by counsel for both sides that ... a plan for faculty [integration was] already in existence." *Vaughns I*, 355 F.Supp. 1034, 1037 n. 3. Later, in a December 13, 1972 opinion, this Court noted that "counsel are agreed that current faculty assignments and proposals probably meet federal constitutional standards and that administration seemingly does not present a particularly difficult issue." *Id.* at 1044, 1045 n. 1. Subsequently, this Court observed that "[b]etween January 1973 and November 27, 1974, all of the non-student attendance issues were resolved by agreement among the parties. One of those agreements was embodied in a consent decree dated February 20, 1974, relating to faculty hiring and promotion." *Vaughns II*, 574 F.Supp. at 1284. The relevant provision of the consent decree read:

> All hiring, promotion practices and other conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, sex, religion or natural origin in violation of the Constitution of the United States or of Title VII
>
> . . . .

*Id.* at 1378. Then, in 1974 and 1975, "this Court relinquished jurisdiction in *Vaughns* subject to the right of any party to seek to have this Court again resume jurisdiction." *Id.* at 1284–85.

## III.

On September 1, 1981, a Motion to Reopen the *Vaughns* litigation was filed by the National Association for the Advancement of Colored People (NAACP). Although the motion was primarily concerned with increasing segregation of student bodies, the NAACP also alleged that the defendants had disproportionately assigned black teachers to predominately black schools and white teachers to white schools and that "[i]n some schools, the number of

---

**10.** July 6, 1972 Joint Stipulation at ¶ 45.

**11.** *Id.* at ¶ 47.

black and white teachers varies by as much as 20 to 25 percentage points from the ratio of black and white teachers in the County as a whole."[12] The NAACP requested that this Court order "[r]eassignment of faculty to eliminate disproportionate assignment of faculty along racial lines."[13]

In its June 20, 1983 opinion, after reviewing the history of the *Vaughns* litigation and the racial composition of the faculties of the County schools, this Court determined that black faculty was not concentrated in the County's black schools, such that the faculty could be said to be "racially identifiable." *Vaughns II*, 574 F.Supp. 1294. Accordingly, the Court made the following findings:

> [W]ith respect to faculty assignments, there presently are no vestiges of past racial segregation, no indications since 1973 of any discriminatory actions or lack of actions, and no violations of any orders of this Court.

*Vaughns II*, 574 F.Supp. at 1295. Accordingly, this Court denied the NAACP's September 1, 1981 request for reassignment of faculty. However, with respect to student assignments, this Court determined that the County had failed to eliminate all vestiges of unconstitutional segregation in the public schools and had violated aspects of the Court's desegregation orders. *Id.* at 1375. Consequently, in its order implementing the *Vaughns II* opinion, this Court held:

> The need for defendants to achieve unitary status as quickly as reasonably possible shall be one of the factors to be considered by defendants in connection with the making of *all* decisions by defendants, including decisions by defendants which may relate to school assignments made since March 1975.

*Id.* at 1377 (emphasis in original). On appeal, the Fourth Circuit upheld this Court's findings that a unitary school system had not been achieved and approved the relief granted in the court below: "Until a school system has discharged its duty to liquidate the dual system and replace it with a unitary one, the school's duty remains in place." *Vaughns v. Bd. of Educ. of Prince George's County*, 758 F.2d 983, 988 (4th Cir.1985). Plaintiffs in *Vaughns II* did not appeal this Court's findings in favor of the Board regarding faculty hiring and assignments. *Id.* at 988 n. 4.

## IV.

Throughout the course of the *Vaughns* litigation, the Board has maintained a two-pronged mechanism for attaining desegregation in faculty assignment. The first mechanism sets an assignment goal by establishing a minimum and maximum percentage range for black representation in the faculty of each school. The Board maintains that, to the extent feasible, it uses the assignment goal as a consideration in making placement decisions for new hires and transfers of faculty. The first assignment goals were put in place in March, 1971 with the promulgation of Rule 4115.3(a).

The second mechanism is a seniority override goal which applies when staff reductions are to be made at a school, typically due to decreased enrollments either in the school as a whole or in given teaching subject areas. The seniority override goal represents the Board's attempt to ensure that the integration parameters for each school are maintained whenever involuntary transfers are required, and mandates that traditional seniority considerations in making such transfers may be overridden when strict adherence to seniority would thwart attainment of minimal integration goals. That policy was articulated, in rudimentary form, in a June 29, 1973 Bulletin from the Assistant Superintendent for Administration and Personnel to principals and central office staff.[14]

---

**12.** September 1, 1981 motion, ¶ 11.

**13.** *Id.* at ¶ 18(b).

**14.** The initial 1973 policy called for the following: "In schools where reductions in staff are necessary because of decreased student enroll-

ment or decreased course registrations *and* where there is less than 19% black faculty, principals are to *waive* the "last in, first out" policy and bypass black faculty members if the selection of such a teacher as a staff reduction causes

From 1971 until the present, the Board has published integration goals regarding faculty assignment in each school in the system. The parameters of the assignment goals have been changed at least three times since they were initially established by the Board in 1971–72. On March 22, 1978, the Board increased the assignment goal for black faculty at each school from its original 11%–25% to a new goal of no less than 21% and no more than 35% black faculty at each school. That change was based, in part, on an increase in the black population of the County which was believed to be approximately 28% in 1978, and a similar increase in minority composition of the County's teacher population. The goal was thus adjusted to the new mean of 28%, with the same 7% deviation as was used previously. In *Vaughns II*, this Court considered and did not object to those revised figures, having determined that "[a]s the percentage of black staff increased as a consequence of the school system's efforts to hire additional black staff members pursuant to the February 20, 1974 consent decree, it became unrealistic to maintain the 11%–25% guidelines." *Vaughns II* at 1293.[15]

In 1980, the Board turned its attention to the implications of involuntary staff reductions upon its faculty integration policy. In a May 27, 1980 memorandum from the Prince George's County School Superintendent, the Board further clarified its faculty assignment guidelines and explicitly outlined the circumstances under which staff seniority rules, which typically governed involuntary transfers, were to give way to desegregation goals in the involuntary transfer of teachers:

[I]n determining the extent to which strict compliance with seniority should be observed in selecting involuntary staff reductions for the schools, if the current black racial membership of the staff is below 21%, then seniority can be adhered to only if the resultant black racial membership does not fall below 11%; if the current black membership of a staff is above 28%, then seniority can be observed only insofar as the resultant black membership of that staff does not fall below 21%; those staffs currently between 21% and 28% black membership may follow normal seniority in determining staff reductions. We should also consider a 40% black membership for a given staff as a maximum.[16]

On July 19, 1985, the Superintendent once again increased the parameters of the assignment goal with the issuance of Bulletin No. S–8–86. The amended policy changed the assignment goal for black instructional staff at each school from 21%–35% to 30%–44%. The bulletin stated that that change was predicated on the Board's policy that the faculty at each school be reflective of the countywide racial composition of all certified professionals employed by the Board.

On September 18, 1986, the Deputy Superintendent, Edward M. Felegy, issued a memorandum adjusting the seniority override parameters to reflect the revised assignment goals. The adjusted parameters required, at a minimum, that seniority be overridden if an involuntary transfer resulted in the black membership on the faculty falling below 21%.[17] This revision

---

a decrease in the minimum percentage of black teachers in that school."

**15.** The Court also noted that "HEW was made aware of that shift [in the assignment goal] when it was made, and indicated no objection to it." *Vaughns II* at 1293.

**16.** Under that policy, as well as subsequent amendments to the policy, normal seniority rules are to be used when staff reductions are made at schools where black faculty membership is within the assignment goals (in 1973, that range was 21%–28% black membership). It should be noted that that provision is open-ended, so that a given reduction of force in such

a school may alter drastically the school's racial balance. In future revisions to the policy, the Board may do well to add a ceiling and floor to the use of normal seniority rules in that situation.

**17.** The relevant portion of the 1986 policy reads as follows:

In determining the extent to which strict compliance with seniority should be observed in selecting involuntary staff reductions for the schools, if the current Black racial membership of a staff is below 30%, then seniority can be adhered to only if the resultant black racial membership does not fall below 21%;

thus increased the minimum black faculty representation required at any given school from 11% to 21%. According to the Deputy Superintendent of Schools, no single event led to the timing of the revision and no precise mathematical formula was used to set the minimum black faculty limit at 21%. A number of factors entered into the determination, among them a recognition that the overall percentage of black teachers in the system had increased by ten percentage points from approximately 18% in 1973 to approximately 28% by 1986; accordingly, the previous seniority override trigger of 11% was also increased by ten percentage points to 21%.

On March 26, 1987, the School Superintendent again changed the parameters of the assignment goal, with the issuance of Bulletin No. S–105–87. The new parameters increased the assignment goal for black instructional staff from 30%–44% to 35%–50%. Those parameters represent the current assignment goals for black faculty. At the same time, in a memorandum issued on March 30, 1987, the Associate Superintendent of Schools, Dr. Jerome Clark, established the current seniority override goals and described how they relate to the new assignment goals:

> Consistent with the understanding discussed with the Attorney to the Board of Education, in determining the extent to which strict compliance with seniority should be observed in selecting involuntary staff reductions for the schools, if the current Black racial membership of a staff is *below 30%*, then seniority can be adhered to only if the resultant black racial membership does not fall *below 25%;* if the current black membership of the staff is *above 35%*, then seniority can be observed only insofar as the resultant black membership of that staff does not

fall *below 30%;* those staffs currently between 30–35% Black membership follow normal seniority in determining staff reductions. We should also consider a 50% Black membership for a given staff as the current maximum.

According to Dr. Clark, the assignment goal maximum was set at 50% because that figure reflected the black population [18] of the County, and because it also maintained the same relationship between the minimum and maximum limitations as was used in previous racial goals. Prior to issuing his March 30, 1987 memorandum, Dr. Clark reviewed recruitment data for the previous years, school-by-school faculty assignment data, and information concerning the racial composition of the population of the County. Dr. Clark's recommendation to revise the goal upwards was in line with both the Board's faculty assignment policy and the Board's minority recruitment efforts; it was designed, in part, to send a message to principals and to members of the school system's personnel department that the policy of racial balance in assignments would be actively pursued, and to ensure that efforts for minority recruitment should be increased.

The Board contends that it adopted and maintains the assignment and transfer policy for two reasons: (i) to prevent schools from "tipping", whereby the racial balance of the faculty in any given school might fall to the point of appearing to be a racially identifiable school insofar as faculty is concerned, and (ii) to provide to every student in every school the experience of being taught by an integrated faculty.

Since the Fourth Circuit's opinion in 1985 in *Vaughns II*, the Board has not sought either judicial approval or consent of the plaintiffs in the *Vaughns* and *NAACP* cases for any of the changes made to the

---

if the current black membership of a staff is above 35%, then seniority can be observed only insofar as the resultant black membership of that staff does not fall below 30%; those staffs currently between 30–35% Black membership follow normal seniority in determining staff reductions. We should also consider a 50% Black membership for a given staff as the current maximum.

**18.** The current black faculty percentage in the school system is approximately 30%.

The factual background discussed *infra* in the body of this opinion with regard to the Board's faculty assignment policy is largely derived from the stipulations of fact jointly submitted by the parties in the Second Joint Report dated April 25, 1989, and appendices to the Second Joint Report.

parameters of its racial goals with respect to faculty.

## V.

In practice, the Board has taken its faculty desegregation goals into account whenever one of three types of personnel actions is undertaken: the hiring and assignment of new teachers, voluntary transfers of existing staff, and involuntary transfers due to a reduction in staff. With respect to involuntary transfers, the seniority override goal may come into play.

The Board maintains that it applies the assignment goals flexibly in all of those situations. When reviewing requests for voluntary transfers, the Board considers the impact of the transfer on the "[e]stablishment of reasonable ratios according to race and/or sex in school faculties" as one of a series of factors.[19] The Board does not, for the most part, refuse to allow teachers voluntarily to transfer out of the school to which they are assigned, even if a transfer would negatively affect the racial assignment goals, because the Board believes such a denial would be educationally unsound and an inappropriate personnel practice. To the extent possible, the racial balance at the school, out of which a teacher transfers, is remedied by the assignment of the replacement teacher. Similarly, to the extent possible, the Board's racial goals are used when referring and placing newly hired teachers, voluntary transfers and involuntary transfers into schools. According to the Superintendent's office, voluntary transfers into a school may be, and

occasionally have been, prohibited, if such a transfer would adversely impact the racial balance of the school.

Candidates for hire as new teachers referred to schools by the Office of Personnel are free to decline positions at the schools to which they are referred. In general, both the principal and a prospective teacher must agree to the placement of the candidate in the school.

Involuntary transfers are those transfers of certified personnel out of schools which are required when there is a reduction in staff at a school due to a decrease at that school in student enrollment[20] or in the number of students electing classes in a particular subject matter, or other changes in program.[21] In order to facilitate an orderly process of making involuntary transfers, a procedure was developed and has been incorporated into the Negotiated Agreement between the Board and the Prince George's County Educators Association (PGCEA), the collective bargaining representative for certificated personnel employed by the Board. That procedure is set forth in Article 4.12 of the Negotiated Agreement, the relevant provisions of which have been part of the Negotiated Agreement between the Board and the PGCEA since the 1974–75 school year. Those provisions, contained in Article 4.12A of the Negotiated Agreement, acknowledge that considerations other than seniority may be used in effectuating involuntary transfers:

---

**19.** The voluntary transfer process is governed by Article 4.11 of the Negotiated Agreement between the Board and the County's teachers. Article 4.11A(1) calls for consideration of the transfer applicant's certification and tenure status, length of service, past evaluations, professional competence with respect to the sought-after position, proximity of the new positions to the applicant's place of residence, and "other relevant factors," as well as implications of the transfer with respect to attainment of assignment goals.

**20.** The Board maintains that involuntary transfers of faculty are largely a result of overall declining enrollment in the County schools. The parties have stipulated that since 1977, 68 elementary, junior and middle schools were

closed by the Board, two new high schools were opened, 45 magnet schools were created, and 19 compensatory education schools were created, all of which actions impacted upon staffing of faculty in the school system. The closing of the 68 schools was due to declining enrollment, which fell from 162,828 in school year 1971–1972 to 144,532 in school year 1976–1977 to 102,530 in school year 1986–1987. The Board has not reduced the number of its teachers since Spring, 1982, except for a limited number of selected positions in trades and industry programs.

**21.** An example of the type of program change which might result in a staff reduction in a particular subject matter teaching area is the elimination of drivers' education.

The Board and the PGCEA recognize that valid educational principles compel the staffing of each public school to be predicated upon such considerations as school enrollment factors and ratios related to race and/or sex of its professional personnel and to that extent involuntary transfers may need to be effected from time to time in order that the Board may conform to such guidelines or criteria of employment as the approved County Board of Education Staffing Formulas or as required by appropriate State and/or Federal Authorities.

Negotiated Agreement, Art. 4.12A. In implementing that policy and in so determining whether an involuntary transfer of a more senior teacher based on race should be made, the Board does not consider the racial composition of the student body at the school from which the teacher is to be involuntarily transferred.

The involuntary transfer process specified in Article 4.12 recurs on an annual basis. Before June 1, teacher staffing at each school for the following academic year is estimated by the Prince George's County Public School's Office of Personnel (Office of Personnel). Those estimates are based on projected student enrollment, student registration for specific classes and the projected schedule of classes. Each principal is notified of the projected number of teachers to be assigned to his or her school for the following fall. When a reduction in staff is mandated by the Office of Personnel, each principal reviews the staffing at his or her school, and based upon projected student enrollment in various classes, determines the subject areas in which the staff reductions are to occur. After the decision that an involuntary transfer must be made, the principal will ask for a volunteer in that subject area to become the "involuntary transfer." If no one volunteers, a teacher holding "less than a standard certificate in the subject area or teaching level to which they are assigned" will become the involuntary transfer.[22] Next, if a nontenured teacher is at the school, he or she will become the involuntary transfer.[23] If there is no volunteer, and no teachers lacking appropriate certification or tenure, the involuntary transfer is ordinarily the "least senior person in the County in that school within the category affected." [24]

However, where the involuntary transfer of the least senior teacher will cause the school to move outside the desegregation goals set by the Board, or if the school already is outside those parameters, a tenured teacher with more seniority than another tenured teacher in the same subject area may be transferred based on the race of the teachers involved.[25] The decision as to whether any involuntary transfers are necessary is made by June 1 of each school year, except that such transfers may be made to correct prior scheduled staffing after the first day of school through September 30 for elementary schools and through October 15 for secondary schools.[26]

The Office of Personnel determines the then "current" racial balance in each school as of May 1 according to staff projections for the next academic year. For example, if it is known that a teacher on leave plans to return to a particular school in the Fall, that individual is considered part of the school's staff in determining racial balance. Any personnel shifts occurring after May 1

---

**22.** Article 4.12A(2).

**23.** A teacher becomes tenured after becoming certificated and after having taught in the County public school system for two years.

**24.** Article 4.12A(3)(a).

**25.** As an exception to that policy, the Board's policy exempts "senior teachers" from involuntary transfer. Such senior teachers are defined as those with 25 years of service or of age 55 or older.

**26.** The appropriate Supervisor of Instructional Personnel within the Office of Personnel notifies the principal as to which individual would be the least senior person in the subject area designated by the principal. The teacher identified as the involuntary transfer is contacted, in person by his or her principal, if possible no later than June 1, and is subsequently notified in writing.

of each academic year affect staffing decisions for the following year.

Once a teacher is involuntarily transferred, the Office of Personnel attempts to place that person in another school to teach a subject for which the teacher is certified. If no opening is available in a teacher's area of certification, the teacher may be placed temporarily as a substitute, or into a subject area other than that for which he or she is certificated, with no resulting loss of pay or seniority. Involuntarily transferred certificated personnel are placed on a list by subject area of certification (by grade level for elementary school teachers, and by subject area for secondary school teacher) in seniority order. Such involuntary transferees are referred to available positions in order of seniority; each is entitled to at least two referrals to schools where appropriate openings exist, if such vacancies are, in fact, available. The order of referrals is determined by seniority within the school system. The employee can turn down the first two such referrals, if two are available, and is then placed by the Office of Personnel.

Since the adoption of the 25%/35% seniority override goal in 1987, 450 involuntary transfers have occurred, of which 35 took place pursuant to the seniority override policy challenged in this litigation. During the 1987–88 and 1988–89 school years, 275 teachers have been involuntarily transferred due to reductions in staff in the school to which they were assigned. Of that total, 27 faculty members were transferred involuntarily in derogation of their seniority pursuant to the seniority override goal. That group of 27 involuntary transfers includes 24 white teachers and 3 black teachers. As of June 1, 1989, for the 1989–1990 school year alone, approximately 175 involuntary transfers had been made by the school system. Of that number, eight were teachers whose seniority was "by-

passed" as a result of the Board's desegregation policy. All eight of those teachers are white. All of those involuntary transfers were triggered by the need to cut staff due to declining enrollment at a school or in a specific subject which attracted less students or by a similar type of attendance or curriculum change.

## VI.

Plaintiffs in the two cases instituted in 1989 are (1) tenured thirty-two white and three black teachers who were involuntarily transferred by the Board in derogation of their seniority pursuant to the Board's faculty assignment policy, and (2) the United States of America.[27] Plaintiffs contend that the Board's use of a race-conscious seniority bypass system in its faculty transfer policy violates both the Equal Protection Clause of the United States Constitution and Title VII of the Civil Rights Act of 1964 because the policy unlawfully discriminates on the basis of race.

Under the best of circumstances, the position of a school board seeking to remedy past discrimination in faculty assignments is an awkward one. Justice O'Connor has aptly described the dilemma faced by a school board such as the defendant in this case:

Public schools, like other public employers, operate under two interrelated constitutional duties. They are under a clear command from this Court, starting with *Brown v. Board of Education*, [349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)], to eliminate every vestige of racial segregation and discrimination in the schools. Pursuant to that goal, race-conscious remedial action may be necessary. On the other hand, public employers, including public schools, must also act in accordance with a "core purpose of the Fourteenth Amendment" which is to "do

---

27. The parties do not dispute plaintiff teachers' right to bring suit here regardless of whether or not this Court finds the Board's policy was required by a court-approved consent decree. In *Martin v. Wilks*, 490 U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), the Supreme Court held that white fire fighters in the City of Birmingham, Alabama have the right to challenge a

court-approved consent decree to which they were not parties. *Id.* at ——, 109 S.Ct. at 197, 104 L.Ed.2d at 849. Writing for the majority, Chief Justice Rehnquist concluded that the white plaintiffs could not be denied the chance to prove that the decree resulted in an illegal race-based preference for black employees. *Id.* at ——, 109 S.Ct. at 189, 104 L.Ed.2d at 842.

away with all governmentally imposed discriminations based on race. These related constitutional duties are not always harmonious; reconciling them requires public employers to act with extraordinary care. In particular, a public employer like the Board must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1844, 90 L.Ed.2d 260 (1986) (citations omitted). The school board's dilemma is harder still to resolve where, as here, the anti-discrimination action at issue is intertwined with a long history of desegregation litigation, and where the challenged conduct also implicates the statutory commands of Title VII.

## VII.

Plaintiffs contend that the Board's policy is unconstitutional for a number of reasons. At its core, plaintiffs' constitutional attack on the policy is predicated on their characterization of the seniority override mechanism as a rigid and purely voluntary, race-conscious plan lacking any remedial purpose. In that context, plaintiffs argue further that the policy neither furthers a compelling state interest nor is designed in a narrowly tailored manner.

To begin with, plaintiffs insist that the Board's policy is unrelated to the desegregation order issued by this Court in *Vaughns I*, and cannot be viewed as remedying the constitutional violations which led to this Court's orders in *Vaughns I and II*. While recognizing the Board's duty to eliminate all vestiges of past racial discrimination in the schools, plaintiffs assert that that duty cannot be accomplished by discrimination against present employees of the Board. Plaintiffs note that race-conscious remedies must be limited to the scope of the underlying constitutional violation, so that even where race-conscious remedies are appropriate, they should play a restricted role in the desegregation process. Once faculty reassignments have

been made and a nondiscriminatory teacher hiring and assignment policy is established, plaintiffs argue, the school district is unitary with respect to faculty, and no permissible remedial predicate exists for this Court or the Board to take further race-conscious faculty action. Further, plaintiffs urge that since the faculty assignment goals were reached in 1973 and since this Court has held that there has been no discrimination in faculty assignment or hiring since that time, there is no basis upon which the Board or the Court may maintain a continuing race-conscious element in the faculty policy of the school system.

Having characterized the faculty desegregation policy as entirely voluntary and independent of the *Vaughns* order, the plaintiffs then argue that the Board's seniority override mechanism is unconstitutional because it is not narrowly tailored to advance a compelling governmental interest. In support of that argument, they cite *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

Plaintiffs maintain that the Board's faculty assignment policy does not meet the standard of review imposed by the Equal Protection Clause with regard to voluntary, race-conscious actions. First, they assert that the plan does not advance a compelling state interest because the Board has failed to identify with specificity a valid remedial purpose for the policy. Citing to this Court's 1983 decision that the Board's faculty assignment policy did not violate the Constitution, plaintiffs conclude that since no remedial purpose for race-conscious relief existed in 1983, no justification existed for the Board three years later to increase its faculty assignment goals. Nor, they maintain, did the process by which the upward ratcheting of the goals was adopted come close to approximating the carefully deliberated findings required by *Croson*.

Finally, plaintiffs argue that whatever its purpose, the Board's policy cannot survive constitutional scrutiny because it is not narrowly tailored. They maintain that narrow tailoring is particularly vital where, as here, the racial classification imposes a

burden on particular individuals and often results in serious disruption of their lives. In that context, plaintiffs suggest that the Board could more effectively achieve its objectives without violating plaintiffs' rights through less intrusive means, such as voluntary transfers, leaves of absence and new teacher assignments. Despite the Board's claims that it attempts initially to assign new teachers to schools in conformity with its racial goals, plaintiffs assert that in reality, the Board's initial teacher assignment practices operate at cross-purposes with the involuntary transfers to achieve racial goals. Plaintiffs argue that tenured teachers should not have their seniority abrogated when the Board could readily achieve its objectives by using other, less burdensome personnel policies.

## VIII.

Any analysis of a school board's attempt to follow a policy of racially balanced faculty assignments must begin with consideration of the "clear command" recognized by Justice O'Connor in *Wygant* and originally articulated in *Brown v. Bd. of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*), and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*): "to eliminate every vestige of racial segregation and discrimination in the schools." *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1844. That duty is a formidable one, and the courts have made clear that it is to be borne, primarily, by each school board itself.

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." *Brown II*, 349 U.S. at 299, 75 S.Ct. at 756. A decade later, the Court reiterated the constitutional duties of local school boards in even stronger terms. In *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court held that it was not enough for school boards which had previously administered public schools in violation of *Brown* merely to eliminate their segregative practices. Rather, such school authorities were

clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch. The constitutional rights of Negro school children articulated in Brown I permit no less than this; and it was to this end that Brown II commanded school boards to bend their efforts.

*Id.* 391 U.S. at 437–38, 88 S.Ct. at 1694 (citations and footnote omitted). Furthermore, the Court in *Green* signalled the need for school authorities to pursue "unitary" status with practical and effective policies: "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Id.* at 439, 88 S.Ct. at 1695 (emphasis in original).

The post-*Brown I* desegregation decisions of the Supreme Court also defined the role of the federal courts when confronting Equal Protection violations in the public schools, and examined the interplay between the court and the school board in such a context. As the Court in *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), made clear, "judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults." *Id.* at 16, 91 S.Ct. at 1276. However, when constitutional violation and "default" by local school authorities exist, courts are vested with significant discretion in crafting a remedy. As early as *Brown II*, the Supreme Court declared: "In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjudicating and reconciling

public and private needs." *Brown II,* 349 U.S. at 300, 75 S.Ct. at 757 (footnote omitted). In *Swann,* the Supreme Court acknowledged that courts may exercise their traditional equitable discretion to devise effective school desegregation remedies, limited by the maxim that "the nature of the violation determines the scope of the remedy." *Swann,* 402 U.S. at 16, 91 S.Ct. at 1272. Within such traditional equitable constraints, *Swann* upheld a wide-ranging remedial order, including measures to achieve racially balanced schools based on the "limited" use of mathematical ratios. *Id.* at 25, 91 S.Ct. at 1280.

In defining the role of the courts, however, *Swann* did not absolve local school authorities of their primary constitutional duties. Indeed, Chief Justice Burger in *Swann* emphasized that the school board's role in effecting desegregation, as a matter of educational policy, remains greater and more flexible than that of the federal court:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the distribution as a whole. *To do this as an educational policy is within the broad discretionary power of school authorities;* absent a finding of a constitutional violation, however, that would not be within the authority of a federal court."

*Id.* at 16, 91 S.Ct. at 1276 (emphasis added).

The broad discretion of school authorities and courts to cure school segregation includes not only remedies involving the assignment of students, but also measures directed at the desegregation of faculties. Thus, the Supreme Court has repeatedly stated that the goal of desegregation efforts must be the achievement of a "uni-tary" school system, *Green,* 391 U.S. at 435–36, 88 S.Ct. at 1692–93, and that, in determining whether unitariness has been achieved, the district court should consider whether the vestiges of discrimination have been eliminated from six facets of the school system: student assignments, transportation, extracurricular activities, facilities, staff and faculty. *Id.* at 436, 88 S.Ct. at 1693. In 1969, the Supreme Court explicitly upheld Judge Johnson's district court order imposing a teacher assignment plan in which the percentage of black teachers in any individual school in the district was to be "substantially the same" as the proportion of black teachers "throughout the system." *United States v. Montgomery County Bd. of Educ.,* 395 U.S. 225, 232, 89 S.Ct. 1670, 1674, 23 L.Ed.2d 263 (1969). In *Swann,* also, the Supreme Court upheld a similar court-ordered faculty assignment plan, and soundly rejected the argument that race-conscious faculty assignment plans are unconstitutional:

> In the companion *Davis [v. Board of School Commissioners of Mobile County]* [402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) ] case, the Mobile school board has argued that the Constitution requires that teachers be assigned on a "color blind" basis. It also argues that the Constitution prohibits district courts from using their equity power to order assignment of teachers to achieve a particular degree of faculty desegregation. We reject that contention.

*Swann,* 402 U.S. at 19, 91 S.Ct. at 1277. In both *Montgomery County* and in *Swann,* relief directed at the integration of faculties was sought on behalf of schoolchildren plaintiffs in order to remedy the segregation of students. *See also Oliver v. Kalamazoo Bd. of Educ.,* 706 F.2d 757, 763 (6th Cir.1983).[28] And in *Zaslawsky v. Bd. of Educ. of Los Angeles City,* 610 F.2d 661 (9th Cir.1979), in a suit by "approximately

---

**28.** In *Oliver,* the Sixth Circuit wrote, in a context in which there was seemingly no discrimination in the hiring of teachers, that the remedy in a school desegregation case "may extend to the composition and assignment of the teaching staff," *id.* at 761–62, citing to *Swann* and *Montgomery County,* but that while "racial hiring quotas for the teaching staff are [not] *per se*

improper," *id.* at 763, "generally, the wiser approach is a more flexible affirmative action program," and that, in any event, "to protect the strong expectations [of teachers in their] seniority rights, the remedy must be 'necessary,' not merely 'reasonable,' to vindicate the constitutional rights of the students." *Id.* (footnote omitted).

25,000 teachers" alleging violation of "their Fourteenth Amendment equal protection rights," *id.,* the Ninth Circuit concluded:

> The action of the school board was not directed toward the employment opportunities available to teaching faculty nor the elimination of any past discrimination in employment. We do not approach the issue in that frame of reference. The focus of this action of the school board was to enhance the educational opportunities available to the students by achieving better racial balance in the teaching faculty throughout the district. This is an educational objective which has been well recognized and approved by the Supreme Court. *Swann* [at 16, 19, 91 S.Ct. at 1276, 1277].

In recent years, the courts, including the Fourth Circuit, have not wavered from the fundamental principle that unitary status is the goal of desegregation efforts, and that all of the six factors referred to in *Green* must be free of the vestiges of discrimination before a school system is to be declared unitary and thus beyond the scope of the district court's remedial powers. *See School Bd. of Richmond v. Baliles,* 829 F.2d 1308, 1312 (4th Cir.1987). The Supreme Court expressly invoked both the language and broad principles of *Green* a decade later in *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 458–59, 99 S.Ct. 2941, 2946–47, 61 L.Ed.2d 666 (1979), when the Court observed that the local school board is charged with the "affirmative duty" to eliminate racial discrimination "root and branch" throughout all aspects of the school system, and that the district court has the duty to ensure the attainment of unitary status through equitable measures, *id.,* quoting *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1693–94. In *Columbus,* the reme-

dial measures included race-conscious staff assignments. 443 U.S. at 467–68, 99 S.Ct. at 2951–52.

Even more recently, the Fourth Circuit has reaffirmed the *Green* principles.[29] In *School Board of Richmond v. Baliles,* 829 F.2d at 1312, Judge Russell wrote: "Under the *Green* test, a school district has achieved unitary status when it is devoid of racial discrimination in regard to faculty, staff, transportation, extracurricular activities, facilities, and pupil assignment." Moreover, the law of this circuit regards unitary status as an indivisible whole, whereby a school district cannot attain unitary status until it is unitary with respect to all of the *Green* factors. In *Riddick v. School Bd. of Norfolk,* 784 F.2d 521, 533 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986), Judge Widener stated that "[a]ll aspects of public education must be freed from vestiges of state sanctioned racial segregation before a school system becomes unitary. Integration must occur in the system's faculty, staff, transportation practices, extracurricular activities, facilities and pupil assignment. *Green, supra,* 391 U.S. at 435 [88 S.Ct. at 1692]." He further suggested that a school district's abandonment of even a voluntary desegregation policy prior to achieving unitary status may constitute an act of resegregation:

> Rescission of a voluntary desegregation plan itself may be found to be an act of segregation for a school board which has been found to have practiced de jure segregation and has not completed the transition from a dual to a unitary system.

*Id.* at 535 (citation omitted).[30]

In 1983, this Court determined that the Prince George's County school system had

---

**29.** The Fourth Circuit has addressed the issues surrounding the achievement of unitary status, first raised in *Green,* on three occasions in the last decade. In two instances, *School Bd. of Richmond v. Baliles,* and *Riddick v. School Bd. of Norfolk,* 784 F.2d 521 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986), the Fourth Circuit declined to overturn the district court's acceptance of unitariness. In *Vaughns II,* as discussed at p. 1280 *supra,* the Fourth Circuit upheld this Court's determina-

tion that the Prince George's County school system had not yet achieved unitary status.

**30.** *See also Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1414 (11th Cir.1985) (until a school district attains unitary status, "'official conduct that has the *effect* of perpetrating or reestablishing a dual system violates [the constitutional] duty to desegregate,'" quoting from *Pitts v. Freeman,* 755 F.2d 1423, 1427 (11th Cir.1985) (emphasis in

not attained unitary status and ordered that:

> [t]he need for defendants to achieve unitary status as quickly as reasonably possible shall be one of the factors to be considered by defendants in connection with the making of *all* decisions by defendants which may relate to school assignments made since March 1975.

*Vaughns II,* 574 F.Supp. at 1377 (emphasis in original). In affirming this Court's finding that the County school system was not unitary, Chief Judge Winter, writing for the Fourth Circuit panel, emphasized:

> The Supreme Court has repeatedly stated that where a school system has been segregated by law, that system has an affirmative duty to eliminate all vestiges of segregation "root and branch." *Columbus Board of Education v. Penick,* 443 U.S. 449, 458–59 [99 S.Ct. 2941, 2947, 61 L.Ed.2d 666] (1979); *Green v. County School Board,* 391 U.S. 430, 437–38 [88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716] (1968). Until a school system has discharged its duty to liquidate the dual system and replace it with a unitary one, the school's duty remains in place. Until a unitary system is created, a school system is not absolved from this duty by reason of demographic changes. *Lee v. Macon County Board of Education,* 616 F.2d 805, 810 (5th Cir.1980).

*Vaughns II,* 758 F.2d at 988.

## IX.

As the record demonstrates, the seniority override concept became part of the Board's faculty desegregation policy initi-

ated before the start of this *Vaughns* litigation. Under pressure from HEW and mindful of the new Maryland anti-discrimination regulation, the Board established Rule 4115.3, at least in part, to bring its faculty assignment practices into compliance with federal and state administrative commands. Prior to the implementation of Rule 4115.3 in 1971, the Board's personnel policies may have embodied some of the same deficiencies as existed in the student assignment practices which violated the Equal Protection Clause.[31] This Court has also observed that, as required by the Supreme Court in *Swann* and *Montgomery County,* HEW's motivation in urging the Board to adopt Rule 4115.3 was to cure overall discrimination in the school system as it affected students as well as the teachers themselves. Thus, had the Board not undertaken a faculty desegregation plan on its own in 1971, this Court would almost surely have been compelled, pursuant to its responsibilities under *Brown II,* to have ordered equitable relief, much like Rule 4115.3, in 1973.

It is in that light that this Court's statement in 1983 that the Board's faculty assignment practices did not violate the 1973 *Vaughns* consent decree must be viewed.[32] The Court understood in 1983 that faculty assignments were made pursuant to Rule 4115.3 and the corollary assignment and seniority override procedures and that, in doing so, the Board was acting in good faith under its continuing affirmative duty to pursue a unitary school system; furthermore, at the time of this Court's 1983 review of the Board's faculty assignment policy, this Court viewed not only the Board's

original); *NAACP v. Lansing Bd. of Educ.,* 559 F.2d 1042, 1055 (6th Cir)., *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977) (where school board has a constitutional duty to desegregate, rescission of a voluntary desegregation plan may be evidence of segregative intent).

31. In a hearing in this case in open court on June 19, 1989, the events which led to the adoption of the Board's 1971 faculty assignment policies were discussed by the parties. At that time, this Court observed: "[Y]ou only have to go back a few years before Vaughns to find that there were constitutional deficiencies in terms of faculty assignments, promotions and the like in the Prince George's County school system in

violation of the Constitution and caused the Court to decree as it did, to issue the decree that it did in the 1972–73 period." Transcript at 14.

32. Specifically, the Court stated that "the record discloses that in 1981–82 black faculty in the Prince George's County school system was spread out among the entire system and was not concentrated in urban schools ... the facts require the conclusion that with respect to faculty assignments, there presently are no vestiges of past racial segregation, no indications since 1973 and indeed before 1973 of any discriminatory actions or lack of actions, and no violations of any order of this court." *Vaughns II,* 574 F.Supp. at 1295.

implementation of Rule 4115.3, but also its ongoing adjustments to those policies, as legitimate efforts to ensure their practical effectiveness.

The County school system has not today achieved unitary status, and remains under court order to eradicate all vestiges of discrimination. No party to the current action, disputes that characterization or challenges its validity in the light of the current legal and factual context.[33] It is also beyond dispute that the Board maintains, to this day, an affirmative duty to pursue unitary status. As *Green* and *Swann* emphasized, the Board can, and indeed must, work to achieve unitariness, even when that pursuit requires race-conscious remedial measures.

It is obvious that the faculty assignment policy constitutes an integral part of the Board's effort to meet its continuing duty to attain unitary status. Had the Board defaulted on that responsibility and failed to ensure that its faculty assignment practices did not thwart attainment of that goal, this Court would have been obligated to issue an appropriate order requiring curative action by the Board. Moreover, had the Board attempted to rescind its current faculty assignment policy, this Court would have been empowered to order the Board to reinstate an acceptable faculty assignment plan.

Because this Court never expressly ordered a faculty desegregation remedy and because this Court found in 1983 that there were no vestiges of discrimination in faculty assignments, plaintiffs contend that this Court no longer possesses the power to order remedial relief in faculty assignments. Such an interpretation of this Court's equitable powers and the school board's affirmative duties overlooks the grant of discretion explicitly and often made by the Supreme Court, as well as the law of unitary status developed by the Fourth Circuit. Thus, the components of a

school desegregation plan are interdependent upon, and interact with, one another, so that changes with respect to one component may impinge upon the success or failure of another.

In *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Supreme Court held that, once the school district had met the specific requirements of a consent decree arising out of school desegregation litigation, the district court no longer had the power to order the school district annually to alter student assignment requirements solely to reflect demographic changes in the school district. *Id.* at 435–37, 96 S.Ct. at 2704–05.

█ The questions in this case, however, cannot be answered by reference to *Pasadena.* To begin with, *Pasadena* dealt with the limits of the *district court*'s power to order race conscious integration measures, while this litigation involves the *Board*'s exercise of its own authority to meet its affirmative obligations to desegregate. As *Swann* made clear, the Board possesses greater latitude to act in pursuit of that goal than does the district court when imposing a remedy when the Board is in default. *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276. Furthermore, the Fourth Circuit in *Vaughns II* identified a second major distinction between *Vaughns* and *Pasadena,* namely, that Justice Rehnquist wrote in *Pasadena* that the case did not involve "a plan embodying specific revisions of the attendance zones for particular schools, as well as provisions for later appraisal of whether such discrete individual modifications had achieved the unitary system required by *Brown v. Bd. of Educ.*" *Pasadena,* 427 U.S. at 435, 96 S.Ct. at 2704 (citation omitted). Chief Judge Winter concluded that the *Vaughns* situation constituted such an exception: "From the inception of the 1973 *Vaughns* order, the parties understood and accepted that the plan was

---

**33.** In their May 1, 1989 brief to this Court, for example, plaintiffs declared that this action "is not an attack on the desegregation litigation to which the *Vaughns* plaintiffs, the school district, and this Court have devoted much constructive effort during the past 18 years. On the con-

trary, we applaud the sincerity and diligence of all involved in the attempt to secure equal educational opportunities for all Prince George's County schoolchildren." *Stone* Plaintiffs' brief at 8.

subject to modification and monitoring.... [T]his case is of the sort excepted by *Pasadena,* and implementation of the Court-ordered plan alone could not relieve the Board of all future responsibility to bring about a unitary system." *Vaughns II,* 758 F.2d at 989.[34]

■ In this litigation, the avoidance of racially identifiable faculties is critical to a desegregation plan like that of Prince George's County which relies heavily on magnet schools. The success of magnet programs, after all, depends on parental choices which in turn may be shaped by perceptions of the characteristics of faculty. Curtailing the Board's power with respect to faculty assignments might result in consequences beyond the resegregation of faculties and could well threaten the success of the overall school desegregation program. If the Board is barred from taking measures in the realm of faculty assignments (or any other of the six *Green* aspects for which no constitutional violation is outstanding), then it could be left with the sole option of altering student assignment policies. Such a drastic limitation with regard to alternatives may well doom the Board's pursuit of unitary status to failure.

Finally, plaintiffs' suggestion that the Board's faculty assignment plan is not remedial given this Court's findings in *Vaughns II* misidentifies the true nature of the Fourteenth Amendment offense at issue here. The principal constitutional compulsion driving this litigation since 1972 lies in the injury to students from the perpetuation of a dual school system, not from employment discrimination against teachers in the County. To disestablish that system and vindicate the rights of school children, the Board can validly implement race-conscious faculty policies even in the absence of employment discrimination against teachers, provided that those policies serve the critical interest of reducing the racial identifiability of individual schools.

The Fourteenth Amendment places a serious affirmative duty on the Board and on this Court to eliminate all vestiges of segregation from its schools. The Equal Protection Clause cannot be read, as plaintiffs urge, to prevent the Board and this Court, when faced with the "real world" task of desegregation, from meeting their respective constitutional responsibilities. Justice O'Connor's observation that school authorities must act with "extraordinary care" in reconciling the sometimes unharmonious constitutional duties implicated in school desegregation, *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848, surely bears repeating here. The Board's implementation and periodic adjustment of a race-conscious faculty assignment plan represent a valid exercise of its affirmative duty, recognized and approved by this Court, to eliminate the vestiges of segregation in its schools.

## X.

■ There remains the question of whether discrete elements of the Board's

---

**34.** In *Morgan v. Nucci,* 831 F.2d 313, 329 (1st Cir.1987), the First Circuit has suggested that once faculty assignment goals have been reached, a district court's role in the school district's faculty assignment policy may, in some circumstances, end. Seemingly, in *Morgan,* the First Circuit read *Pasadena* as holding that a school district can become unitary in piecemeal fashion and, in effect, achieve one *Green* factor at a time.

In *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969) (en banc), *rev'd sub nom.* on other grounds, *Carter v. West Feliciana Parish School Board,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970), the Fifth Circuit upheld the district court's race-conscious faculty assignment order to remedy unconstitutionally segregated public school conditions. *Id.* at 1218. However, in *Fort Bend Independent School District v. City of Stafford,* 651

F.2d 1133, 1138 (5th Cir.1981), the Fifth Circuit characterized *Singleton's* acceptance of such measures only to the extent that they create a "limited preference for employees demoted or dismissed as a result of desegregation related reductions in staff," and rejected the proposition that "in the process of conversion from a dual to a unitary system, a school district must maintain, as a minimum, a percentage of minority faculty members equivalent to that which it employed prior to desegregation." *Id.* at 1138. *See also Lee v. Russell County Bd. of Educ.,* 563 F.2d 1159, 1161 (5th Cir.1977).

Careful reading of the First and Fifth Circuit opinions suggests that neither Court intended to deprive a district court—and certainly not a school board—of the use of faculty assignments to achieve unitariness in the school system itself.

current seniority override policy reflect a reasonable exercise of the Board's duty. Plaintiffs contend that the plan fails as a rigid and arbitrary mathematical quota.

With respect to the policy designed in the early 1970's and as it was implemented for at least a decade, this Court disagrees. The Court is, of course, mindful of the Supreme Court's repeated warnings with respect to the use of rigid mathematical ratios in remedial measures. *See, e.g., Swann,* 402 U.S. at 25, 91 S.Ct. at 1280. However, flexible mathematical goals have always played an important part in the shaping of desegregation remedies, both voluntary and court-ordered. *See* cases cited at pages 1288–89 *supra.* The assignment policy initially articulated and adhered to by the Board represents just such a reasonable, flexible use of mathematical guidelines. As the record indicates, the broad goal of the policy is to ensure that racial faculty identifiability in a given school is avoided by setting a goal for black representation within that school's faculty which approximates black representation in the teaching population of the entire school system. In 1971, that range was 11%–25%, within seven percentage points of the County's total black teaching population of 18%. That range was chosen pursuant to Rule 4115.3, which requires that teaching staffs at individual schools "be generally consistent with the County-wide racial composition of all teachers employed by the Board." As the countywide percentage of blacks in the total county population and the teacher population increased over the next decade, the Board raised the acceptable black faculty range of its assignment goal to 21%–35% in 1978. The percentage of blacks in the County's population was approximately 28% at that time, and the public school faculty was then approaching 25.9%, the percentage for the 1980–81 school year.[35]

The seniority override mechanism is based on the parameters contained in the assignment goals. Therefore, in 1980, the policy called for seniority to be overridden in schools with less than 21% minority teachers if the staff reduction would bring that percentage to below 11%; in schools with less than 28% minority teachers, the seniority override trigger was 21%; and a maximum black membership was set at 40%. Although the NAACP and the *Vaughns* plaintiffs challenged those assignment parameters as erroneously relying on total county population rather than the county teacher population, the policy was upheld by this Court in the *Vaughns II* decision. 574 F.Supp. at 1293.[36] The Court accepted the revised parameters, however because of the increase in black teaching staff as a percentage of total teachers, making it "unrealistic to maintain the 11%–25% guidelines." *Id.* In other words, despite the contentions of plaintiffs in *Vaughns II,* this Court viewed the challenged parameters as keyed to systemwide teacher population regardless of whether those parameters were also in line with general countywide population.

Since 1981, the County has continued to increase both the numerical assignment goal and the seniority override triggers so that the overall range now stands at 35%–50%, with the seniority override mandated whenever a seniority-based involuntary transfer would decrease a school's black faculty membership to 25% or 30%, depending upon the black membership prior to the transfer,[37] with a maximum black membership of 50%. However, the percentage of black teachers systemwide has not, since 1981, increased correspondingly with countywide population. The proportion of black teachers rose steadily until the 1983–84

---

35. Those statistics for the racial composition of the County's teacher staff are derived from Exhibit 19 of the Parties' Second Joint Report to this Court dated April 25, 1989.

36. *See* pp. 1280–81 *supra.*

37. The differential triggers arise as follows: "[I]f the current Black racial membership of a staff is below 30%, then seniority can be adhered to only if the resultant black racial membership does not fall below 25%; if the current black membership of the staff is above 35%, then seniority can be observed only insofar as the resultant black membership of that staff does not fall below 30%...." Bulletin No. S–105–87.

school year, when it reached 29.3%. Since then, however, it has remained relatively constant, reaching a high of 31.2% in 1987–88, but dropping to 29.7% in 1988–89. That steady state is also reflected in statistics revealing the racial composition of the County's new faculty hires, which has averaged 29%–30% for the past five years.[38] County school officials have acknowledged that since 1981 certain changes in the assignment goals have been motivated, at least in part, by the rising percentage of blacks in the total County population, rather than within its teaching staff.

As a practical matter, the Board's faculty assignment policies, in recent years, have largely required individual schools to maintain black faculty membership at levels higher than the systemwide black teacher population. Effectively, the policy goes beyond that of preventing given schools from becoming racially identifiable, or from allowing disproportionate numbers of teachers of one race to comprise the faculty of individual schools. Thus, in some instances, the policies currently followed by the Board require race-conscious transfers when the black representation dips below 30%, in a school system with a systemwide black faculty composition of only 29.7%.[39]

The Supreme Court has only upheld plans for racially balanced faculties as part of remedies for school segregation when their purpose has been to eradicate the racial identifiability of schools. In those cases, the measures invariably linked the assignment goals to the ratio of minority teachers systemwide. In both *Swann* and *Montgomery County*, the Supreme Court approved court-ordered assignment plans designed to achieve racial balance in individual schools within the defendant school systems by setting numerical goals for each school which reflected the minority composition of the district's teaching population. *Swann*, 402 U.S. at 19–27, 91 S.Ct. at 1277–82; *Montgomery County*, 395 U.S. at 232–33, 89 S.Ct. at 1674–75. Even when reviewing policies designed to cure direct discrimination against black teachers, courts have questioned relief being predicated upon the percentage of minorities in the district's general population or the district's student population. The Supreme Court rejected such a remedy in *Wygant*, 476 U.S. at 274–75, 106 S.Ct. at 1847, as a violation of the Equal Protection Clause. Similarly, the Fifth Circuit held, in *Fort Bend Independent School District v. City of Stafford*, 651 F.2d 1133 (5th Cir.1981), that it was wrong for a district court to find that a school system was not unitary simply because the percentage of minority teachers employed by the district did not equal the percentage of minorities in the county's general population. *Id.* at 1138.

Finally, the current numerical parameters used by the Board are subject to attack under the Fourteenth Amendment because they tend to operate as rigid quotas. Although the Supreme Court in *Swann* upheld the use of mathematical assignment ratios as "no more than a starting point in the process of shaping a remedy" *Swann*, 402 U.S. at 25, 91 S.Ct. at 1279, the Court forbade their use as an "inflexible requirement." *Id.* In this case, where the seniority override process is in a number of instances subject to being triggered whenever a school's black staff membership is below 30%, and the total proportion of black teachers countywide is three-tenths of a percentage point below 30%, the mechanism approaches being a rigid statistical ratio which may well lead, unless black teacher hiring increases dramatically, to a requirement that some schools maintain a

**38.** The proportion of blacks teachers among new hires has been as follows: 1984–85—27.3% black; 1985–86—32.6%; 1986–87—26.0%; 1987–88—31.1%; 1988–89—26.7%.

**39.** The Prince George's County school officials acknowledge that the assignment parameters were also designed as a means of prodding more aggressive race-conscious recruitment by principals. Ultimately, the only way that the assignment goals may be met is by increasing

new minority hires. While explicit hiring goals may of course be appropriate where the employer has set forth the appropriate record of discrimination, *Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851–52, defendants have not provided evidence or even argued that current hiring practices or policies are discriminatory, or that they contribute to the racial identifiability of the County's schools.

virtually identical racial balance of 30% black teachers to 70% white teachers.[40]

With respect to the 50% maximum of black teachers permitted before the seniority override is triggered, this Court concludes that the Board's policy is reasonable. The goal of preventing racial identifiability of schools is well served by the determination that a single school's employment of a majority of black teachers, in a system which employs only 29.7% black teachers, may render that school racially identifiable. Furthermore, the difference between the 50% maximum trigger and the current racial composition of the faculty will effectively permit the County to pursue its policy of active minority faculty recruitment without being affected by the upper limit of the assignment goals.

In sum, the Board's assignment policy, as broadly enunciated in Rule 4115.3 and subsequent policy statements through 1983, is a valid exercise of the Board's affirmative duty to eradicate the vestiges of unconstitutional segregation in the Prince George's County Public Schools. That policy legitimately includes mechanisms by which teacher seniority may be overridden when making involuntary transfers as part of a reduction in staff. However, the present numerical parameters by which the seniority override may be triggered must be revised so as to be based upon the racial composition of the teaching population systemwide, rather than the proportion of blacks throughout the County's general population. The Board will therefore be ordered to adjust the current parameters embodied in its assignment plan so that assignment goals, including seniority override triggers, are premised upon acceptable numerical ranges reflect-

ing black membership in the County's teacher population.

## XI.

■ Because the Board has implemented its faculty assignment policy to fulfill its affirmative duty to eradicate the vestiges of discrimination, pursuant to orders of this Court, the Board's choice of means to achieve that end is entitled to be accorded substantial discretion consistent with the Supreme Court's teachings in *Green* and *Swann*. Were this not the case, and were the Board's policy a strictly voluntary measure independent of any action of this Court, then the policy of the Board under challenge in this school desegregation litigation may be subject to a higher standard of review. In a series of plurality opinions regarding voluntary affirmative action measures taken by governmental authorities to remedy discrimination during the last decade, the Supreme Court determined that the Equal Protection Clause commands a rather high degree of scrutiny of race-conscious actions, although a majority of the Court was unable, until recently, to agree with regard to the precise level of review. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Wygant*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). However, last term, in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a majority of the Supreme Court held that in order for governmentally ordered affirmative action to pass muster under the Equal Protection Clause of the Fourteenth Amendment, such action must serve a compelling interest and also be narrowly tailored.[41]

**40.** Such possible rigidity is mitigated only slightly by the two-tiered nature of the seniority override. In particular, the mechanism is triggered in schools with less than 30% minority staff only if the involuntary transfer would decrease that proportion to below 25%. However, only approximately 22% of the County's 139 schools maintained black faculty membership within the range of 25%—30% in the 1988–89 school year and could therefore be theoretically subject to the 25% trigger, rather than a 30% trigger. Moreover, 25 of the 34 schools in the 22% are

elementary schools which typically have small faculties (20–30 teachers) where even a single staff reduction would bring the minority membership below 25%.

**41.** In *Croson*, five justices concurred with Justice O'Connor's opinion. Justices Brennan, Marshall and Blackmun dissented. Three justices, Chief Judge Rehnquist and Justices White and Kennedy, concurred in Sections II and III–A of Justice O'Connor's opinion and, in so doing, agreed with Justice O'Connor that volun-

The race-conscious program at issue in *Croson* required construction contractors to subcontract a minimum of 30% of each contract with the City of Richmond, Virginia to "minority business enterprises," *i.e.*, businesses more than half-owned by members of various racial and ethnic minorities. *Id.* at ——, 109 S.Ct. at 712–13, 102 L.Ed.2d at 871. A prime contractor could obtain a waiver from the 30% requirement only upon a showing that the set-aside could not be accomplished after seeking out minority enterprises from a nationwide pool of minority-owned businesses. *Id.* at ——, 109 S.Ct. at 713, 102 L.Ed.2d at 872.

In the absence in the findings of the Richmond City Council of citation to specific evidence of discrimination in the Richmond construction industry, Justice O'Connor rejected the plan, first, because it did not advance a compelling interest. The Court found that disparities between the number of city contracts awarded to minority firms and the size of Richmond's minority population could be explained by many reasons, not all of which suggested discrimination, *id.* at ——, 109 S.Ct. at 707–25, 102 L.Ed.2d at 866–87, and that the courts could not rely on a local government's facial characterization of an affirmative action plan as "remedial." *Id.* at ——, 109 S.Ct. at 724, 102 L.Ed.2d at 886. In the light of the city's failure to point to "identified discrimination," the Court held that the city had failed to demonstrate a compelling interest for its action. *Id.* at ——, 109 S.Ct. at 727, 102 L.Ed.2d at 889.

The Court also noted that the plan did not seem to be narrowly tailored, pointing to a lack of evidence that the City had considered any race-neutral means of bolstering minority contracting, *id.* at ——, 109 S.Ct. at 728, 102 L.Ed.2d at 890, and to the plan's use of a "rigid numerical quota" *Id.* at ——, 109 S.Ct. at 728, 102 L.Ed.2d at 891.

In *Croson*, the majority opinion speaks with broad language but does not express-

ly limit its holdings to voluntary plans or expressly exempt school districts operating under court decrees. However, if *Croson* is so read, it would appear substantially to change the careful delineation of the roles of local school authorities and federal courts emphasized by the Supreme Court in *Swann* and in other school desegregation decisions. In that light, it is certainly questionable whether the Supreme Court intended in *Croson* to change such settled law in school desegregation cases rather radically in the absence of explicit statement of that intention.

It is significant, too, that two justices writing separate opinions in *Croson* drew a distinction between school desegregation actions and other governmental conduct to which strict scrutiny applies. *Id.* at ——, 109 S.Ct. at 737, 102 L.Ed.2d at 901–02 (Scalia, J., concurring in the judgment) ("In my view there is only one circumstance in which the States may act *by race* to 'undo the effects of past discrimination'; where that is necessary to eliminate their own maintenance of a system of unlawful racial classification.... This distinction explains our school desegregation cases, in which we have made plain that States and localities sometimes have an obligation to adopt race-conscious remedies."); *see also* Marshall, J. dissenting, *id.* at ——, 109 S.Ct. at 755, 102 L.Ed.2d at 924 ("this Court's remedy-stage school desegregation decisions" should not be "cordoned off" from those subject to *Croson*'s standards; instead, affirmative action cases should be accorded the same remedial treatment as school desegregation cases because they "stand for the same broad principles of equal protection").

It is also to be noted that in this litigation this Court does not deal with a plan independently and voluntarily conceived and executed by a school board and thus does not deal with the type of affirmative action issue present in *Bakke* and *Wygant.*

tary affirmative action programs established by state or local government must advance a compelling interest and be narrowly tailored. In a separate concurrence, Justice Scalia stated: "I agree with much of the Court's opinion, and, in

particular, with its conclusion that strict scrutiny must be applied to all governmental classification by race...." *Id.* at ——, 109 S.Ct. at 735, 102 L.Ed.2d at 899.

Rather, there exists a court-ordered plan which includes a faculty component which this Court would have ordered as part of its 1973 decree if the Board itself had not instituted such a program under federal and state governmental prodding.

In his dissenting opinion in *Croson*, Justice Stevens wrote: "I therefore do not agree with the premise that seems to underlie today's decision, as well as the decision in *Wygant v. Jackson Bd. of Educ.*, that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong." *Id.* 488 U.S. at ——, 109 S.Ct. at 730, 102 L.Ed.2d at 893. Since this is a case in which the challenged actions of the Board—and indeed of this Court—were clearly taken solely for the purpose of constituting one of the remedies for the past wrong of *de jure* discrimination within the County school system, *Croson*'s strict scrutiny standard would not appear to be applicable herein. However, assuming *arguendo* only, that the *Croson* standard does govern in this litigation, in any event, in this Court's view, that standard has been met, subject, however, to one revision which this Court will require the Board to make, whether or not *Croson*'s strict scrutiny standard applies.

## XII.

■ The Board contends that the action challenged herein involves the overriding of seniority of black as well as white teachers, does not prefer one racial group over another, and, thus, is not a true affirmative action plan. Still, the challenged action does classify and burden individual teachers on the basis of race. *Croson* seemingly subjects all such classifications to strict scrutiny, *id.* at ——, 109 S.Ct. at 720–21, 102 L.Ed.2d at 881–82, and specifically states that "the standard of review under the Equal Protection Clause is not depend-

ent on the race of those burdened or benefited by a particular classification." *Id.* at ——, 109 S.Ct. at 721, 102 L.Ed.2d at 882.

In evaluating what purposes may justify race-conscious governmental actions, the Supreme Court has stated prior to *Croson:* "The government unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987). In *Croson*, citing to past decisions of the Supreme Court, Justice O'Connor observed that the goal of counteracting general, "societal discrimination" is too "amorphous" to function as a compelling interest. *Croson*, 488 U.S. at ——, 109 S.Ct. at 723, 102 L.Ed.2d at 884. That observation reiterates the statement in *Wygant* that "[t]his court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, this Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. The specific "showing of prior discrimination" necessary to pass strict scrutiny may be derived from "judicial, legislative, or administrative findings of constitutional or statutory violations." *Croson*, 488 U.S. at ——, 109 S.Ct. at 723, 102 L.Ed.2d at 884, citing *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757.

Under *Croson*'s first requirement of a compelling state interest, it would appear that faculty assignment policies intended to prevent individual schools from becoming racially identifiable constitute a compelling educational objective. The Board has long maintained that the faculty assignment and transfer policy serve the purpose of preventing such racial identifiability in individual schools.[42] As noted *supra*, in *Green*,

42. The Board has also indicated a second purpose for the challenged plan, *i.e.*, to provide students with the experience of being taught by a diverse, integrated faculty. In that regard, it is to be noted that the Supreme Court has granted school boards broad power to reassign students *and* faculty on the basis of race in recognition of the critical role which faculty inte-

gration plays in creating equal educational opportunities, *see Green, Montgomery County, supra*, and the benefits which accrue to all students from interaction with both white and black teachers. For example, in *Columbus Bd. of Educ. v. Penick*, 443 U.S. at 467, 99 S.Ct. at 2951, the Supreme Court stated its agreement with the Sixth Circuit's conclusion that the de-

the Supreme Court held that school authorities possess an affirmative constitutional duty to ensure that unitary status is achieved, and that fulfillment of that obligation is to be measured, in part, by faculty assignment policies and practices. Then, in both *Montgomery County Board* and *Swann I*, the Supreme Court explicitly upheld race-conscious teacher assignment programs even when those race-conscious integration plans utilized prescribed racial balance ratios. *Id.* 402 U.S. at 16, 91 S.Ct. at 1276. The Court reiterated that conclusion in *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1285, 28 L.Ed.2d 586 (1971):

> We observed in *Swann* ... that school authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements.

The rationale for having a racial balance among students to remedy discrimination

applies equally well to a faculty integration plan.

Recognizing the authority of a school board voluntarily to implement a policy of faculty integration through involuntary reassignment of teachers, courts have approved faculty reassignment plans similar to the Board's policy challenged in this litigation. *Kromnick v. School District,* 739 F.2d 894 (3rd Cir.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *Caulfield v. Bd. of Educ.,* 632 F.2d 999 (2d Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *Zaslawsky v. Bd. of Educ. of Los Angeles Unified School District,* 610 F.2d 661 (9th Cir.1979); *Bolin v. San Bernadino City Unified School District,* 155 Cal.App.3d 759, 202 Cal.Rptr. 416 (4th Dist.1984). Indeed, in *Kromnick,* the Third Circuit determined that a strikingly similar plan implemented voluntarily, *i.e.,* in the absence of a court order finding the system in violation of the Equal Protection Clause, in the Philadelphia public schools would pass strict scrutiny.[43] And in each of those cases, the faculty assignment policy under review withstood Equal Protection challenges.[44]

fendant school board's policy of faculty segregation served " 'to deprive black students of the opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools.' " *Id.,* quoting *Penick v. Columbus Bd. of Educ.,* 583 F.2d 787, 814 (6th Cir.1978). More recently, individual members of the Supreme Court have reaffirmed the importance of integration, and in particular, faculty integration, in education. In her concurring opinion in *Wygant,* Justice O'Connor concluded that "a state interest in the promotion of racial diversity has been found sufficiently 'compelling', at least in the context of higher education, to support the use of racial considerations in furthering that interest." *Id.* 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring), *citing, Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61. Justice Stevens has explained the benefits to be gained from faculty integration:

> [O]ne of the most important lessons that American public schools teach is that the diverse ethnic, cultural and national backgrounds that have been brought together in our famous 'melting pot' do not identify essential differences among the human beings that inhabit our land. It is one thing for a white child to be taught by a white teacher

> that color, like beauty, is only 'skin deep'; it is far more convincing to experience that truth on a day-to-day basis during the routine, ongoing learning process.
> *Wygant,* 476 U.S. at 314–15, 106 S.Ct. at 1868.

**43.** In *Kromnick,* the Third Circuit asserted, in a pre-*Croson* context, that strict scrutiny was not required in the review of Philadelphia's voluntary seniority override policy and opted instead to apply intermediate scrutiny. In so doing, that Court observed that "even if the intermediate standard of review ... were not deemed appropriate, the result would be the same if we apply the more rigorous standard used to evaluate affirmative action programs under which members of minority groups are given a preference." *Kromnick,* 739 F.2d at 903.

**44.** The cases in the Second and Ninth Circuits and in the Court of Appeals of California upheld voluntary faculty assignment plans but did not explicitly subject the school policies to strict scrutiny.

In *Zaslawsky,* the Ninth Circuit upheld the voluntary faculty integration plan of the Los Angeles Unified School District (LAUSD) which required mandatory reassignment of teachers on the basis of race. The LAUSD had implemented the plan at the insistence of HEW and in the absence of a finding of *de jure* segrega-

In *Kromnick*, the Philadelphia Board of Education sought to maintain a faculty ratio at each school of between 75% and 125% of the systemwide proportions of white and black teachers employed by the Board to ensure that the racial composition of each school's faculty reflected that of the overall teaching staff. The Philadelphia policy achieved that goal, in part, by the operation of a seniority override procedure quite similar to the Prince George's County policy:

> To reach this [75%/125%] objective, the School District annually reassigns some classroom teachers to other schools. The reassignment plan operates in two phases. First, there is a determination of the need for staff at each school. Because of declining student enrollment, each year many schools have fewer positions. Open positions are staffed in order of accumulated seniority at the school, and the least senior teachers are transferred

from the school. However, if that would cause the school to fall outside the 75%/125% range, teachers of the overrepresented race are transferred even though they have more seniority.[45]

*Id.* at 896.

The origins of the Philadelphia plan are also similar to those of the Prince George's County policy. The faculty assignment guidelines were the result of a consent decree entered into between the state and the Philadelphia school district. *Id.* at 897. In 1982, the Office of Civil Rights [OCR] of the U.S. Department of Education found the Philadelphia school district " 'substantially in compliance' " with its regulations and determined that the school district was " 'under no further obligation to continue to meet the 75%/125% standard;' " however, the school district was to " 'continue to use nondiscriminatory policies' in placing

---

tion. The ultimate goal of the plan adopted by the LAUSD "was to have each school's faculty make-up reflect, within a range of plus or minus ten percent, the district-wide composition of thirty percent racial and ethnic minorities and seventy percent non-minorities." 610 F.2d at 662.

In upholding the LAUSD plan, which resulted in the mandatory transfer of several hundred teachers, the court cited the Supreme Court's approval of voluntary race-conscious faculty integration plans in *Montgomery County* and *Swann, supra.* The Court reasoned that school boards "should have just as much discretion in formulating *faculty* integration plans" as they have in formulating *student* integration plans when their goal is "to carry out an educational policy to achieve better racial balance." *Id.* at 664 (emphasis added). Furthermore, Judge Hug distinguished the LAUSD's faculty integration plan from affirmative action plans directed at employment opportunity:

> The action of the school board was not directed toward the employment opportunities available to teaching faculty nor the elimination of any past discrimination in employment. We do not approach the issue in that frame of reference. The focus of this action of the school board was to enhance the educational opportunities available to students by achieving better racial balance in the teaching faculty throughout the district. This is an educational objective which has been well recognized and approved by the Supreme Court. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. at 16, 19 [91 S.Ct. 1267, 1277–78, 28 L.Ed.2d 554] (1971).

*Id.*

Another faculty assignment policy similar to that of Prince George's County survived constitutional and statutory challenges in a California state court in *Bolin.* To comply with HEW directives, the San Bernadino Unified School District required that each school maintain a minority faculty composition of not less than half or more than twice the districtwide ratio of 29% *Id.* 202 Cal.Rptr. at 418. Citing *Swann,* the court upheld the faculty integration plan as a valid exercise of the school board's discretion to implement programs which promote integration and further held that the plan did not discriminate on the basis of race, but merely required that assignment of teachers be reasonably balanced throughout the school district. 202 Cal. Rptr. at 419–21.

Finally, in *Caulfield,* the Second Circuit upheld the implementation of HEW directives for race-conscious faculty assignment in the New York City public schools. The Court, upholding Judge Weinstein, found the assignment plan which required that each school's faculty reflect, within five percentage points, the racial and ethnic composition of the teacher population systemwide, "a reasonable and valid effort by the Board to comply with Titles VI and IX." 632 F.2d at 1003, n. 5 & 1006.

**45.** Also, like the Prince George's County policy, the Philadelphia seniority override mechanism produced relatively few transfers in derogation of seniority. As the Third Circuit noted: "Only a small percentage of teachers transferred are transferred in derogation of seniority. In the last year, approximately 50 or 60 of the 1,100 teachers transferred were transferred to maintain the 75%/125% racial balance." *Kromnick,* 739 F.2d at 896.

teachers." *Id.* at 899, quoting Letter From Department of Education dated June 23, 1982. The School Board, nevertheless, voted to continue the policy for the upcoming school year. The Board based its decision, in part, on a report and written study by its personnel department that if the 75%/125% policy were abandoned in favor of free choice in teacher assignments, the level of faculty integration would slip. *Id.*

An employment discrimination class action was brought in federal district court against the school district by teachers subject to involuntary transfer under the policy. The district court struck down the school district's continued voluntary adherence to the 75%/125% policy as a violation of the Equal Protection Clause and of Title VII. *Id.* On appeal, the Third Circuit reversed, concluding that the policy violated neither the Equal Protection Clause nor Title VII.[46]

First, the Third Circuit determined that faculty integration as a means of improving "the quality of education of those who have suffered the effects of racial prejudice and segregation" served an important and valid remedial purpose.[47] *Id.* at 905. Noting that integration of faculty has long been recognized as an appropriate remedy for *de jure* segregation, it held that "[f]aculty integration is also an appropriate remedy for a system that has suffered *de facto* segregation." *Id.* at 906. The Court also construed the remedial nature of the policy in light of the long history of the school desegregation litigation in Philadelphia:

> The district court apparently believed that once the School District was relieved by the OCR in 1982 of the obligation to maintain the 75%/125% policy, its action in continuing that policy ceased to be remedial. The district court ignored the 15 year history of state proceedings against the school district, which are still

pending in the state court, directed to effecting integration of the Philadelphia public school system. The long history of Philadelphia public schools as "racially identifiable" as either white schools or black schools cannot be gainsaid.

*Id.* at 904. Thus, the Third Circuit rejected an argument also made in this case: that once it has been determined that faculty policies themselves are in compliance with statutory and constitutional requirements, school authorities may no longer continue to impose race-conscious teacher assignment measures. Instead, in *Kromnick*, the Third Circuit determined that the district had a strong interest in ensuring that schools not revert to racially identifiable faculties. *Id.* at 903–04.

In the wake of *Croson*, the District Court for the Eastern District of Texas applied strict scrutiny to a voluntary faculty assignment action and found it constitutionally deficient. In *Covington v. Beaumont Independent School District*, 714 F.Supp. 1402 (E.D.Tex.1989), Judge Schell held that the transfer of two white varsity high school football coaches to positions on the school's sophomore coaching staff and their replacement with black coaches with less seniority did not serve a compelling interest. *Id.* at 1413. The court rejected the argument that the transfers served any remedial interest, because they occurred after the school district had been declared unitary in 1984 by the same federal district court:

> "[T]he permissible use of race-based remedies in school desegregation is limited by the scope of prior constitutional violations. The Court's previous unequivocal language in declaring [the district] unitary, in closing the desegregation case, in dissolving all desegregation orders implementing permissible race-based classifications, and in declaring that faculty and

---

**46.** The court's analysis of the Title VII claims is discussed in part XIV, *infra*.

**47.** The Court observed that a racially diverse faculty enhanced the educational opportunities for otherwise racially isolated students: "Schools are great instruments in teaching social policy, for students learn not only from

books, but from the images and experiences that surround them. One such lesson is of a spirit of tolerance and mutual benefit, a lesson that is more difficult to absorb when schools attended by black students are taught by black teachers while schools attended by white students are taught by white teachers." *Id.* at 905.

staff are integrated in every school, forecloses the argument that the racially motivated reassignments of [plaintiffs] were in furtherance of remedying pre-unitary discrimination.

*Id.* at 1411 (footnotes omitted). Applying *Croson,* the court also rejected the second justification proffered by the school board: the interest in providing an "integrated education experience" to students. *Id.* at 1411–12. The court quoted from *Croson:* "Classifications based on race carry a danger of stigmatic harm. Unless they are *strictly* reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Id.* at 1412, citing *Croson,* 109 S.Ct. at 721 (emphasis added in *Covington*). The district court concluded that, under *Croson,* the goal of providing an integrated educational environment, standing alone, "is necessarily defective because it lacks a remedial purpose." *Covington,* 714 F.Supp. at 1412.

The faculty assignment policy in Prince George's County, if anything, promotes interests stronger than those supporting the policies in effect in *Kromnick, Zaslawsky, Caulfield* and *Bolin,* and does not possess the deficiencies identified in *Covington.* First, as described in detail *supra,* the Prince George's County school system practiced *de jure* racial segregation until 1954 and, in 1972, this Court held that segregation continued to exist in schools within the County and imposed court-ordered desegregation on behalf of black pupils in the County. *See Vaughns I.* In 1983, this Court and the Fourth Circuit reviewed the Board's progress in desegregating the school system and found that vestiges of racial segregation still existed and held that the school system had not yet achieved unitary status. *Vaughns II.* As a consequence, the Board continues to operate under this Court's order to desegregate the school system. There is no dispute that today the school system, as a whole, has not yet attained unitary status.

Second, the faculty assignment policy at issue here was not imposed "voluntarily" by the Board; rather, it was the result of specific state and federal directives to inte-

grate public school faculties and staffs. Although faculty assignment was not contested and litigated in the 1972 *Vaughns I* case, it was quite clear in 1972 that the Court and counsel on both sides believed that faculty assignment policies were among the factors to be considered, and the Court was advised by both parties that the policies were satisfactory. Accordingly, there was no need and no request for any formal order from this Court. In 1983, elements of the Board's faculty assignment policy were among the issues litigated, and this Court found that the policy, as it operated at that time, did not violate any order of this Court. *Vaughns II,* 574 F.Supp. at 1295. As a means of pursuing unitary status, the policy was deemed to be working.

As the Supreme Court's school desegregation opinions state, measures—including race-conscious faculty assignment—taken by courts and school boards to achieve unitary status in a district, previously held to be non-unitary, serve a vital interest. The recent federal and California state cases specifically upholding faculty assignment policies similar to those in effect in the County reflect that principle and recognize that such plans may be critical components of efforts to eliminate the vestiges of past discrimination and racial identifiability in the public schools. *See* page 1298, *et seq., supra.*

In *Croson,* Justice O'Connor explained the Court's rationale in imposing strict scrutiny in the review of race-conscious state measures:

> Indeed the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. This test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

*Croson,* 488 U.S. at ——, 109 S.Ct. at 721, 102 L.Ed.2d at 881. In this case, the Board's motive does not approach "illegit-

imate racial prejudice or stereotype." Rather, herein, the Board's pursuit of unitary status through the use of a race-conscious faculty assignment plan advances a compelling state interest.

### XIII.

■ Again assuming *Croson*'s strict scrutiny standard to be applicable, it is necessary to reach the second prong of that test, namely, whether the plan under challenge herein is narrowly tailored. *Croson* states that "the means chosen [must] 'fit' compelling goals so closely" that any improper purpose may be "smoked out." *Id.* However, the Supreme Court has not provided a bright-line "test" for the determination of whether a race-conscious program is narrowly tailored, but, instead, has suggested a series of factors for courts to consider. In *Croson,* the Court concluded that the Richmond program was objectionable because it perceived that various race-neutral measures may well have achieved the goal of increasing minority participation in the city's construction trades as well as the racial preference could. *Id.* at ——, 109 S.Ct. at 728, 102 L.Ed.2d at 890. The Court also faulted the fixed, 30% minority set-aside as a rigid quota which could not "be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Id.* at ——, 109 S.Ct. at 728, 102 L.Ed.2d at 891 (citation omitted).

Earlier, in decisions cited in *Croson,* the Supreme Court provided other measures by which courts could analyze whether a program is narrowly tailored. In *Paradise,* Justice Brennan's plurality opinion listed a series of factors to be considered in reviewing race-conscious employment remedies, including "the necessity for the relief and the efficacy of alternative remedies; the

flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals in the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1067. And in Justice Powell's plurality opinion in *Wygant,* in which the Court overturned a racial preference in teacher layoffs,[48] Justice Powell concluded that the plan was insufficiently tailored because "other, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available." *Wygant,* 476 U.S. at 283–84, 106 S.Ct. at 1852. Justice Powell further wrote:

> In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Id.* at 282–83, 106 S.Ct. at 1851 (emphasis in original).

With these guidelines in mind, this Court concludes that the Board's faculty assignment policy, including the seniority override mechanism, as originally conceived and executed in 1971, was narrowly tailored. However, specific aspects of the plan, as it now operates under amendments to the original policy, no longer meet the requirement of narrow tailoring.

Plaintiffs contend that the seniority override component of the Board's faculty assignment policy is overly intrusive. In support of that position, plaintiffs have filed affidavits of involuntarily transferred teachers to demonstrate that a transfer in derogation of seniority is not merely a matter of inconvenience, but a disruption of stability and security as well. Plaintiffs urge this Court to consider whether either race-neutral or less intrusive race-conscious

---

**48.** The program at issue in *Wygant* was contained in a provision of the collective bargaining agreement of the teachers and the Board of Education of Jackson, Michigan. According to that agreement, the seniority of white teachers could be bypassed when teacher layoffs were required if adhering to seniority would result in the layoff of a greater percentage of minority teachers than the percentage of minority teachers employed by the district. 476 U.S. at 270–71, 106 S.Ct. at 1845.

alternatives could have been implemented. In particular, they suggest that the Board can more effectively achieve its objectives through other personnel actions, such as voluntary transfers, leaves of absence and new teacher assignments, and that, in any event, the Board's teacher assignment practices operate at cross-purposes with the Board's racial goals.[49]

After considering the overall structure and operation of the faculty assignment policy, this Court is unpersuaded that that policy, as originally promulgated, lacks a close "fit" to the goals of eliminating the vestiges of unconstitutional discrimination and ensuring that school facilities do not become racially identifiable. The plan embodied by Rule 4115.3 and subsequent directives issued through 1983, when this Court ruled that the assignment policy was constitutionally acceptable, conforms to all of the indicia of narrow tailoring. To begin with, the policy has been, at least until recently, remarkably flexible. Under the Board's policy, race is to be considered only in conjunction with other factors, including curriculum needs and individual teacher preferences in every instance. Of the thousands of personnel decisions made in the County since 1987, in all but a handful of cases, i.e., the 35 involuntary transfers of the *Stone* plaintiffs, no race-conscious actions have been taken without the assent of the teachers involved. In that light, the seniority override mechanism can only be viewed as a very small component in an otherwise flexible and, for the most part, voluntary teacher assignment system. For that system to meet its ultimate goals, however, there must be some means by which the Board can ensure that the attributes of flexibility and voluntariness do not undermine the effectiveness of the policy. While teachers and principals have broad discretion in assignment matters, the policy must include a "bottom line," a point below which the administration and staff of any given school may not lapse and thereby risk racial identifiability. With its multi-levelled seniority override provision, the Board, in the 1970's, carefully crafted such a "bottom line" to its policy and thus ensured flexibility.

There is another flexible provision to the Board's original policy which enables it to pass muster under the narrow tailoring approach called for by *Croson*, namely, the use of ranges of racial representation, both in the general assignment goal and the seniority override procedures. Those ranges avoided fixed mathematical ratios or rigid numerical quotas. *Croson*, 488 U.S. at ——, 109 S.Ct. at 728–29, 102 L.Ed.2d at 891; *Swann*, 402 U.S. at 25, 91 S.Ct. at 1280; *Montgomery County*, 395 U.S. at 234, 89 S.Ct. at 1675. For example, the original Board policy allowed schools maintaining less than the systemwide average of black faculty to fall five percentage points below that average before involuntary transfers are initiated.

Further, unlike the preferential layoff provision struck down in *Wygant*, the policy challenged herein does not impose severe economic or other severe consequences upon individuals. No teacher has ever suffered a layoff, a reduction in pay, or a loss of seniority or professional status as a result of the seniority override. Involuntarily transferred teachers are reassigned to similar positions at the same levels of income, seniority, and professional status. They, of course, may not like such transfers. A transfer of a relatively senior teacher from one school to another may, at best, be inconvenient and often genuinely disruptive. In their affidavits, some of the plaintiffs in *Stone* complain of longer commuting distances, inconvenient working hours, less desirable working environments and new positions less suited to their skills and interests. Although apparently no *Stone* plaintiff has alleged any loss of direct income, there is always a possibility that a transfer may result in the loss of a paid, extracurricular position (e.g., as an after school coach). Such concerns are not trivial. However, they do not rise to a level of deprivation or disruption such as

---

**49.** Plaintiffs cite as an example that in 1988, in the schools from which nine of the twelve teachers were involuntarily transferred on account of race, teachers of the same race were subsequently hired into those same schools.

that caused by the loss of a job in *Wygant* and the deprivation of an opportunity to compete for a construction contract in *Croson*. The latter are far greater intrusions into the lives of individuals affected by a race-conscious policy than are the consequences of involuntary transfer under the Board's policy.

Plaintiffs argue that the Board's policy could be more narrowly effectuated by imposing limits on voluntary teacher transfers and by basing the initial placement of newly hired teachers on race. The Board, however, maintains that racial guidelines are already used, to the greatest extent possible, in the assignment of newly hired teachers and in assigning voluntary transfers into schools. Although plaintiffs have documented isolated examples of involuntary transfers followed by new hires of the same race of the transferee, those instances do not establish a pattern, and may be at least partially accounted for by the vagaries of the region's highly competitive market for teachers.[50] Also, prohibiting the voluntary transfer by teachers out of schools and restricting the initial placement of new hires merely shifts the burden from teachers who are transferred involuntarily to those who are not allowed to leave their current assignments or are not allowed to choose their first assignment. The resulting burden would be no less intrusive and may affect far more teachers. With respect to a plan directed at new hires, depriving a teacher of a job via race-conscious hiring goals is probably more intrusive than requiring a teacher to transfer to a different school while maintaining the same economic and professional status. With respect to the use of race-conscious limitations on voluntary transfers, it would seem neither more nor less intrusive to insist that a teacher involuntarily take a new position than to require a teacher to remain in a position which he or she desires to leave. In addition, the Board deems that kind of change in its current policy to be

both educationally unsound and inappropriate personnel practice. Similarly, the Board, seemingly with good reason, has concluded that race-conscious restrictions on the opportunity of new hires to assent to initial placement, and subsequent mandatory limitations on a teacher's ability voluntarily to transfer out of a school, are unwise recruitment and hiring policies, particularly in a recruiting area as competitive as one next door to Washington, D.C.

The Board's reassignment policy is only one component of a comprehensive faculty assignment plan which also assigns new hires, voluntary transfers and teachers returning from leave to advance the dual goals of meeting the needs of curriculum and of promoting faculty integration. Alternative faculty integration plans proposed by plaintiffs appear to be no more flexible, just as intrusive and perhaps more likely to burden a greater number of teachers than the present policy.

Finally, and most importantly, the actual implementation of the policy demonstrates the narrow tailoring of the program. Of the thousands of personnel actions, and hundreds of involuntary transfers in the school system during the past three years, the challenged policy accounts for fewer than thirty instances in which seniority was bypassed. According to the Board, of 6,000 teachers employed by the system in 1987–88, only 0.1% were transferred involuntarily in derogation of seniority in 1987, and 0.22% were so transferred in 1988. More significantly still, prior to 1987, before the effects of erroneous alterations to the assignment parameters were made, as discussed *supra* and *infra,* the Board successfully pursued its assignment policy without making any involuntary transfers in accord with the seniority override.

In sum, the Board's basic faculty assignment policy, as it existed at the time of the *Vaughns II* decision in 1983, is narrowly tailored.[51] However, to the extent that the

---

**50.** Prince George's County, a large part of which lies within the metropolitan area of Washington, D.C., competes for teachers with the District of Columbia and with other counties in

Maryland and Virginia bordering upon the District of Columbia.

**51.** That view on the part of this Court is consistent with that expressed by the Third Circuit in

present specific numerical triggers for operation of the seniority override now reflect an effort to conform to the proportion of blacks in the County as a whole, rather than to the proportion of black teachers in the school system, the Board's procedures are no longer narrowly tailored. As discussed earlier, page 47 note 40 *supra*, the current parameters for the involuntary transfer of white teachers, in virtually all schools in the district, trigger seniority override if black faculty membership is below 30%. In a system comprised of only 29.7% black teachers, and a trend of new hires at approximately the same minority percentage, that practice will largely operate as an inflexible 30% black teacher quota. As such, the current parameters as they apply to white teachers [52] will function as the kind of rigid numerical ratio condemned in *Croson* as not "narrowly tailored to any goal, except perhaps racial balancing" and "resting on the completely 'unrealistic assumption' that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Croson*, 488 U.S. at ——, 109 S.Ct. at ——, 102 L.Ed.2d at 891 (citation omitted). Accordingly, to pass strict scrutiny, and also for the reasons discussed *supra* at part X, the Board's current seniority override parameters require amendment to reflect the racial composition of the County's teaching staff, pursuant to Rule 4115.-

3, rather than the composition of the population of the County as a whole.

## XIV.

■ There remains the question of whether the seniority override component of the Board's faculty assignment policy violates Title VII of the Civil Rights Act of 1964. Broadly, Title VII prohibits discrimination based on race in employment:

It shall be an unlawful employment practice for an employer—

(1) to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) (1989). In addition, Title VII protects the terms, privileges and conditions of employment, including specific exceptions for the terms and conditions of seniority systems and the rights which accrue to employees through such systems.[53]

Under the employment system in Prince George's County, teachers acquire greater privileges as they gain seniority within the school system, including a superior right to remain at a school at which the teacher is assigned against that of a less senior teacher. Those provisions are among the "terms, conditions, or privileges of employment" protected by Title VII.

*Kromnick* in which the court determined that a very similar faculty assignment policy was "narrowly tailored" for many of the same reasons cited by this Court:

The School District's plan requires some teachers of both races, primarily if not exclusively those with little seniority, to bear the burden of transfers and of diminished choice upon transfer. The transferred teachers retain jobs with the School District and retain accumulated seniority at their new schools. They also retain some exercise of choice of schools when it would not conflict with the 75%/125% policy.... Moreover, the number of teachers affected has been comparatively small in recent years.... There is no evidence before us that the impact of the 75%/125% policy falls more heavily on one race than another....

*Kromnick*, 739 F.2d at 907. Although the 75%/125% ratio in *Kromnick* was numerical, the court viewed it as sufficiently flexible since it provided a wide range within which the racial

composition of an individual school's faculty might diverge. While herein, as opposed to *Kromnick*, the impact of the challenged policy does fall more heavily on white teachers than black teachers, it is not designed so to do.

**52.** For reasons discussed earlier at pp. 1294–95 *supra*, the 50% trigger for seniority override of black teachers appears to be a flexible and narrowly tailored policy.

**53.** Title VII, *codified at* 42 U.S.C. § 2000e-2(h) (1989), states:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.

§ 2000e–2(a)(1). Moreover, discrimination against persons of any race violates Title VII, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–89, 96 S.Ct. 2574, 2577–78, 49 L.Ed.2d 493 (1976), which applies to public, as well as to private, employers. *Johnson v. Transp. Agency, Santa Clara County*, 480 U.S. 616, 627 n. 6, 107 S.Ct. 1442, 1449–50 n. 6, 94 L.Ed.2d 615 (1987).

Whether an employer has violated Title VII by disparate racial treatment of one or more employees is determined according to a framework set forth in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At the outset, a plaintiff bears the burden of proving a prima facie case of such discrimination by the preponderance of the evidence. The burden of production, but not the burden of persuasion, then shifts to the employer to justify, with a nondiscriminatory rationale, the employer's challenged action. If the defendant provides such a justification, the plaintiff must prove, again by a preponderance of the evidence, that the justification articulated by the employer was a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 801–04, 93 S.Ct. at 1823–25.

The United States contends that it has made a prima facie showing of racial discrimination by disparate treatment violative of Title VII. That initial burden of proof has been characterized by the Supreme Court as "not onerous" and intended to "eliminate[ ] the most common nondiscriminatory reasons" for a personnel action against the defendant. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. It is undisputed that the 35 plaintiffs were transferred pursuant to the Board's policy in derogation of established seniority rights solely on the basis of their race. As such, plaintiffs have established a prima facie

case of discrimination and are entitled to "a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254, 101 S.Ct. at 1094.

Thus, the Board is obligated to articulate a legitimate, nondiscriminatory reason for its policy. The United States argues that the Board has not offered, and cannot offer, such a justification. Once again asserting that this Court has never found discrimination in the County's faculty assignments and has never ordered any relief related to the Board's employment policies, the federal government seems to contend that any voluntary effort so to do by the Board cannot serve as a justification under Title VII. In essence, the United States suggests that Title VII limits the purposes for which the Board can act as least as narrowly and as extremely as does the Equal Protection Clause under *Croson*'s strict scrutiny standard.

The federal government's characterization greatly overstates the employer's burden of proof. As the Supreme Court has repeatedly stated, that burden is met if the defendant can "articulate some legitimate, nondiscriminatory reason for [its action]." *Id.* at 253, 101 S.Ct. at 1093, quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The court in *Burdine* asserted that the employer is not even required to justify its action by a preponderance of the evidence. *Id.* 450 U.S. at 259–60, 101 S.Ct. at 1096–97. Rather, "the employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Id.* at 256, 101 S.Ct. at 1095, quoting *Bd. of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 297, n. 2, 58 L.Ed.2d 216 (1978).

The Board has articulated two purposes for its assignment policy: to ensure that schools do not become racially identifiable and to provide children with diverse educational experiences.[54] As explained at

---

54. In full, the justification proffered by the Board is as follows: "The purpose for establishing and maintaining guidelines is to insure that schools do not become racially identifiable as Black schools or White schools in terms of faculty assignment, and to provide children of

all races the opportunity to be exposed to racial diversity in their educational experiences. The goal of any desegregation plan is to eliminate schools which can be identified as Black schools or White schools, and to move toward the goal

pages 1297–98 *supra,* the goal of avoiding racial identifiability in a school is a purpose which withstands even strict scrutiny. Obviously, it far exceeds the relaxed requirements of *Burdine* because the goal of providing to schoolchildren a racially diverse learning environment is clearly a legitimate one under Title VII. Congress, in enacting Title VII, hardly intended that such a purpose could be illegitimate. To the contrary, as the Third Circuit in *Kromnick* has observed, "the legislative history of [Title VII] shows special concern for improving the education of students through diversified staff." 739 F.2d at 910. The Senate Report regarding 1972 amendments to Title VII explicitly stated:

> It is difficult to imagine a more sensitive area than educational institutions, where the youth of the Nation are exposed to a multitude of ideas and impression that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote existing misconceptions and stereotypical categorizations which in turn would lead to future patterns of discrimination.

*Id.* quoting S.Rep. No. 415, 92d Cong., 1st Sess. 12 (1972) U.S.Code Cong. & Admin. News 1972, p. 122. By positing two important educational goals, the Board has met its intermediate burden of articulating "some legitimate, nondiscriminatory reason" for its policy. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

Moreover, the federal government has failed to demonstrate that those purposes of the Board are pretextual, as required by the third prong of the *McDonnell Douglas* framework. Indeed, the United States has failed to present *any* evidence, much less a preponderance of the evidence as required by the Supreme Court, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, that "the legitimate reasons offered by the defendant were not its true reasons." *Id.*

Nor does the Board's plan "unnecessarily trammel" upon the interests of affected employees. *Johnson,* 480 U.S. at 630, 107 S.Ct. at 1451, quoting *Steelworkers v. Web-*

*er,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). Both *Weber* and *Johnson* involved voluntary affirmative action plans with explicit minority preferences. In contrast, the Board's assignment policy, while race-based, does not directly prefer any specific racial group. However, the Board's plan is a general policy which mandates overriding established seniority rules according to race-based criteria, just as did the preference plans in *Weber* and *Johnson.*

In *Weber,* writing for the majority, Justice Brennan noted that the challenged plan did "not require "the discharge of white workers and their replacement with new black hires" or "create an absolute bar to the advancement of white employees," *id.* 443 U.S. at 208, 99 S.Ct. at 2730, and that it was "a temporary measure." *Id. See also Hammon v. Barry,* 813 F.2d 412, 428 & n. 32 (D.C.Cir.1987), *reh'g granted,* 833 F.2d 367 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1036, 108 S.Ct. 2023, 100 L.Ed.2d 610 (1988), in which Judge Star, despite agreement by the parties that there had been a history of racial segregation in the District of Columbia's Fire Department, stated that there was not "the slightest logical nexus between the generation-old violation and the present-day remedy" where there "were no relics from yesteryear to overcome." As discussed several times *supra,* in this litigation, such relics remain today to be overcome.

In any event, the Board's assignment goal does not "unnecessarily trammel" the interests of transferred teachers. It does not require the discharge of any employee. Nor does it impede promotion or erode professional status, salary or seniority. Nonetheless, the United States contends that the Board's policy unnecessarily overrides the rights of the involuntarily transferred teachers by virtue of both its duration and the parameters which it utilizes for requiring transfers.

As the Third Circuit observed in *Kromnick,* 739 F.2d at 911–12, the fact that the assignment goal has been in place for a

of just schools." May 15, 1989 Memorandum of    the Board at 10.

period of years does not necessarily compel the conclusion that it was intended to be permanent. In *Kromnick,* the court looked to two factors to ensure discontinuation of the assignment plan after the need for race-conscious measures were eliminated: the fact that the plan was embodied in the collective bargaining agreement which was regularly renegotiated by the Board and the teachers' union; and the continuing role of the state court in monitoring the school system's desegregation efforts.[55]

Both of those safeguards are present in this case. First, the collective bargaining agreement between the Board and the Prince George's County teachers union explicitly recognizes the occasional need to override traditional seniority considerations to meet the assignment goals. *See supra* page 1283. That agreement is renegotiated periodically, with the most recent contract in effect for three years. Second, as long as this Court maintains jurisdiction over the *Vaughns* case, proceedings before this Court "will afford an opportunity for reconsideration of the plan in light of the overall effort to eliminate racially identifiable schools in the school system." *Kromnick,* 739 F.2d at 912. Indeed, this opinion marks the third occasion upon which this Court has considered the legality of the Board's faculty assignment plan. This Court perceives the Board's assignment policy not as a permanent measure, but rather as a temporary aid to the eventual achievement of unitary status which, hopefully, will occur in the near future.

The federal government's second argument, that the specific, current parameters for triggering the seniority override mechanism used by the Board in recent years are

inappropriate, has greater force. The general characteristics of the Board's Rule 4115.3 are acceptable under Title VII, for the same reasons that they meet constitutional requirements, as discussed at pages 1292–93 *supra.* The assignment goal is flexibly crafted, denies no employee continued employment or access to a job, and infringes on no promotion, salary or seniority rights. Rule 4115.3, as promulgated in 1972, is based upon a policy narrowly tailored to the Board's stated goals of preventing racial identifiability and promoting diversity. However, as stated earlier in this opinion, at pages 1293–94 *supra,* the Board has in recent years changed the specific numerical parameters which trigger the seniority override mechanism in a manner which no longer accords with those goals.

Because the parameters of the present plan are not calibrated to the relevant black labor group, *i.e.,* teachers within the County, they result in an overly broad remedy for the discrimination which the Board seeks to cure. Were this a case involving a challenge that the Board had discriminated against blacks in the recruitment and hiring of *teachers,* then a race-conscious remedial program which sought to bring the percentage of black teachers toward a goal predicated on the minority composition of the larger labor market, *i.e.,* the County's population as a whole, may be appropriate. *See, e.g., Johnson,* 480 U.S. at 634, 107 S.Ct. at 1453.[56] But here, where the Board's primary goal is to ensure, for purposes related to education of students, that the faculties of individual schools do not become racially identifiable, the proper benchmark is the proportion of teachers

---

**55.** Although the Philadelphia school system was not under a desegregation order of the federal court, the Board had entered into a consent decree in state court as the result of proceedings brought under Pennsylvania law by the Pennsylvania Human Relations Commission. *Kromnick,* 739 F.2d at 987.

**56.** Even if it were appropriate to look beyond the proportion of black teachers already employed by the County, it may not be proper, in a case involving professional employees with specialized training, to set parameters according to the entire county population. *See Hazelwood*

*School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), in which the Supreme Court ruled in a Title VII challenge against the hiring policies of the school district, that a finding of discrimination could not be based upon student population; the "proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition and the racial composition of the qualified public school teacher population in the relevant labor market." *See also Croson,* 488 U.S. at ——, 109 S.Ct. at 725, 102 L.Ed.2d at 887.

employed by the Board systemwide. By setting the seniority override trigger to reflect the countywide black population, the Board has increased the likelihood that involuntary transfers based on race will be made, infringing on the "legitimately firmly rooted, expectation[s]" of more senior teachers in a needlessly broad manner. *Id.* at 638, 107 S.Ct. at 1455. Therefore, with respect to that aspect of the plan, the Board's policy unnecessarily trammels the rights of disfavored employees and violates Title VII.

### XV.

This Court will promptly confer with counsel concerning the entry of an appropriate order as required by this opinion, and with regard to scheduling further proceedings concerning the issues of immunity and damages.